**CALIFORNIA CANNERS & GROWERS ASSOCIATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 2–77.**

United States Claims Court.

April 18, 1986.

Julian B. Heron, Jr., Washington, D.C., for plaintiff. Christine C. Ryan, Peter J. Plocki, Heron, Burchette, Ruckert & Rothwell, Washington, D.C., Loyd McCormick, and McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., of counsel.

William S. Liebman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. David M. Cohen and Sandra P. Spooner, Washington, D.C., of counsel.

Before the Review Panel: H. ROBERT MAYER, Judge Presiding, and KENNETH R. HARKINS and LAWRENCE S. MARGOLIS, Judges.

## REPORT OF REVIEW PANEL

Senate Resolution No. 225, referred the pending bill S.1894, 95th Cong., 1st Sess., to the Chief Judge of the United States Claims Court for action in accordance with 28 U.S.C. §§ 1492 and 2509. After a trial of nearly twelve weeks, and compilation of a record of more than 5,000 pages of transcript and 1,000 exhibits, the hearing officer filed an exhaustive report which accompanies this review. Only so much of the substance of the report as is necessary to the review panel decision is recited here.

### Background

An amendment of the Food, Drug, and Cosmetics Act (FDCA) in 1958 defined most food ingredients as "food additives," and provided a statutory framework for pre-market safety testing by manufacturers and processors, and approval by the Food and Drug Administration (FDA) before those ingredients were used in food. The proponent of a food additive was required to prove its safety to the FDA which signified its approval by the issuance of a food additive regulation. The definition of food additive excluded any ingredient that is

generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use....

21 U.S.C. § 321(s). This exclusion resulted in FDA's issuance of its "generally recog-

nized as safe" or GRAS list. 21 C.F.R. § 121.101. Therefore, substances which are food additives and those which are GRAS are mutually exclusive.

■ By exempting GRAS substances from the definition of food additive, Congress allowed the marketing of GRAS substances without the pre-market safety testing and prior government approval required for food additives. This established that ingredients which had long been used in foods without apparent harmful effects, such as salt, sugar and other familiar substances, would not have to undergo extensive new testing to be used in food products.

Except for the definition, no further clarification of the term "generally recognized as safe" was provided. The new legislation required the courts, rather than the FDA, to determine if a substance is GRAS. Nevertheless, because whether or not a substance is GRAS determines if it can be marketed without the prescribed testing and approval, the FDA issued a list of substances which it believed were GRAS as a guide to its personnel and as advice to the regulated industries.

The regulation embodying the GRAS list, however, stated that

It is impracticable to list all substances that are generally recognized as safe for their intended use. However, by way of illustration, the Commissioner regards such common food ingredients as salt, pepper, sugar, vinegar, baking powder, and monosodium glutamate as safe for their intended use. The lists in paragraph (d) of this section include additional substances that, when used for the purposes indicated, in accordance with good manufacturing practice, are regarded by the Commissioner as safe for such uses.

21 C.F.R. § 121.101(a). The subparagraph (d) referred to in the regulation included the artificial, nonnutritive sweeteners, sodium cyclamate and calcium cyclamate.

At a press conference on October 18, 1969, the Secretary of Health, Education

and Welfare announced that he was "ordering the artificial sweetener, cyclamate, be removed from the list of substances generally recognized as safe for use in foods." He continued, in relevant part, as follows:

Recent experiments conducted on laboratory animals disclosed the presence of malignant bladder tumors after animals had been subjected to strong dose levels of cyclamates for long periods. The findings of these experiments form the basis for my action.

The fact that cyclamates have induced cancer in animals was confirmed by a panel of the National Academy of Science, which unanimously reported its findings to me late yesterday. The academy met in special session at my request to review the results of various research projects involving cyclamates. Before I go any further, let me emphasize in the strongest possible terms that we have no evidence at this point that cyclamates have indeed caused cancer in humans.

Thus, my decision to remove cyclamates from the list of approved substances in no sense should be interpreted as a "life saving" or emergency measure. I have acted under the provisions of law because it is imperative to follow a prudent course in all matters concerning public health.

The Secretary also said the use of cyclamates in general purpose foods and beverages was to be discontinued immediately; that general purpose foods and beverages were to be withdrawn from the marketplace in accordance with a stated schedule; and products containing cyclamates would remain available to persons whose health depended upon them, if they were labelled as drugs to be consumed upon the advice of a physician. The Secretary made subsequent statements reported on television that there was "solid evidence that [cyclamates] produced cancer in the bladder of mice and rats" and that "cyclamates are very clearly carcinogenic."

The same day, the United States Surgeon General made these remarks:

I want to begin by reinforcing as strongly as I can the statement by Secretary Finch on the meaning of the scientific findings which provide the basis for the action being taken here today. There is absolutely no evidence to demonstrate in any way that the use of cyclamates has caused cancer in man. There is no evidence that the use of cyclamates has caused malformation in children or any other abnormality in humans, other than a rare skin hypersensitivity.

The decisions being announced here today are based on bladder tumors obtained by feeding massive doses of cyclamates throughout the life span of rats. The dosage thus shown to cause these tumors in rats is 50 times the maximum amount previously proposed for adult human ingestion by the National Academy of Sciences and by the World Health Organization.

. . . .

As I stated a few moments ago developments leading to our presence here today began on Monday of this week when Dr. Umberto Saffiotti, Associate Scientific Director for Carcinogenesis with the National Cancer Institute, notified me that Abbott Laboratories had important new data regarding cyclamates. On Tuesday, October 14, I met with Dr. James Price, Abbott Vice President for Experimental Therapy, and other Abbott officials. They reviewed data they obtained from University of Wisconsin studies in June 1969 which showed that cholesterol pellets with 20 percent sodium cyclamate produced significantly increased numbers of urinary bladder tumors when injected into the cavity of the urinary bladder of Swiss mice. The tumors were found when the mice were sacrificed after 16 months. The technique used, however, is controversial, and the significance of positive findings unknown.

At that time, Abbott Laboratories had underway a chronic toxicity experiment for other purposes at the Food and Drug Research Laboratories in Long Island,

New York. These experiments, begun in May 1967, were designed primarily to determine if liver, kidney or blood toxicities resulted from long term feeding of cyclamate-saccharin mixtures. With the information regarding pellet implantation experiments, the Abbott Laboratories group, with the advice of the National Cancer Institute and the Food and Drug Administration, decided to focus attention on the histology of the rats' urinary bladders. Upon completion of the experiment, a special investigation of the urinary bladders of the experimental rats was made.

A summary of this test was given to me on October 14 by the Abbott people. I immediately asked for all the experimental data including slides, in order that a review might be undertaken by experts at the National Cancer Institute. This review was conducted and completed on October 15 and October 16. Review was performed by Dr. Saffiotti, Dr. Roger O'Gara and Dr. Catherine Snell, all experts in experimental pathology and in experimental carcinogenesis. All concurred that eight of the slides submitted contained malignant tumors, three of which were infiltrating carcinomas of the bladder.

I then invited Dr. Gilbert Friedell, a world authority on bladder tumors, to come to the National Cancer Institute at Bethesda to review these slides and the slides of the control animals. He did so on October 16. He concurred with findings by the previous reviewers. All pathologists reviewed the slides and the data independently of one another and submitted their findings to me.

Finally, the full data were made available to the National Academy of Sciences National Research Council Ad Hoc Subcommittee reviewing cyclamate safety at the FDA's request. The opinion of this Subcommittee, which met October 16 and 17, and the opinion of FDA reviewers, was unanimous—the cyclamate-saccharin mixture induces cancer of the bladder in rats using the dosages and under the conditions of the experiment. This result

was not observed in previous experiments, probably because the urinary bladders of the test animals were never examined. There was no reason to suspect damage to that organ system until last summer when Abbott scientists first learned that implantation of pellets of cyclamate and cholesterol in the bladder cavity caused bladder tumors in mice.

Again, I must emphasize that this result was obtained only at feeding high dosages for the entire life of the animals. The level of cyclamates required to produce these tumors in rats was 2500 mg. per kilogram per day. After a thorough review, the NAS–NRC Subcommittee met in executive session yesterday afternoon, independently confirmed our interpretation of the information, and recommended that we remove cyclamates from the list of approved food substances for general use.

I would make one further point: We have no indication that human bladder cancer from whatever cause is increasing to any significant degree.... We can in no way at this time extrapolate the new data from rat experiments to human beings. Nevertheless, we in this Department—whether from a legal or from a scientific point of view—cannot afford to ignore any possibility of the rat data being applicable to the human population. As long as this possibility exists, a prudent concern for the health of the public dictates that precautionary action be taken.

Similarly, the Commissioner of the FDA issued a statement in which he concurred in the instructions issued by the Secretary, announced the removal of cyclamates from the GRAS list, and explained the withdrawal of cyclamate-containing products from the marketplace.

On October 21, 1969, the FDA published an order in the *Federal Register* removing cyclamates from the GRAS list. In pertinent part, the order said,

On the basis of animal studies recently reported to the Food and Drug Administration by Abbott Laboratories, and the

review of the studies and the underlying data by experts in the National Cancer Institute, by an outside consultant, and by an ad hoc Committee of the National Academy of Sciences-National Research Council, Food Protection Committee, the Commissioner concludes that cyclamates can no longer be regarded as generally recognized as safe for use in food.

Accordingly, pursuant to the provisions of the Federal Food, Drug, and Cosmetic Act ... and under authority delegated to the Commissioner ..., Part 121 is amended as follows:

1. Section 121.101. *Substances that are generally recognized as safe* is amended by deleting from paragraph (d)(4) the items "Calcium cyclamate (calcium cyclohexyl sulfamate)," "Magnesium cyclamate (magnesium cyclohexyl sulfamate)," "Potassium cyclamate (potassium cyclohexyl sulfamate)," and "Sodium cyclamate (sodium cyclohexyl sulfamate)".

Amendment to Part 121, 34 Fed.Reg. 17,-063 (1969) (codified at 21 C.F.R. § 121.-101(d)).

The report of the National Academy of Sciences, referred to in the October 18 statements of the Secretary and Surgeon General and in the October 21 *Federal Register* order, was prepared by the Academy's Ad Hoc Committee on Nonnutritive Sweeteners (Ad Hoc Committee). The Committee was composed of eminently qualified individuals, and was the most competent group which could have been assembled to evaluate the safety of nonnutritive sweeteners. The Committee's October 17, 1969, report to the government stated the following:

From the data reported by personnel of Abbott Laboratories, National Cancer Institute, and the Food and Drug Administration pertaining to the carcinogenic potential of cyclamate and its metabolite, cyclohexylamine, it is the unanimous opinion of the National Academy of Sciences ad hoc committee on nonnutritive sweeteners that there is sufficient evidence to conclude that the material test-ed (a 10:1 mixture of cyclamate and saccharine and cyclohexylamine) was carcinogenic under conditions of the described experiments.

The Committee has examined the data and finds sufficient evidence of the apparent carcinogenic potential of these materials to indicate that they clearly fall within the definition of substances "known to induce cancer." Although the committee felt that the evidence strongly suggests that cyclamate or cyclohexylamine is the active substance, the most persuasive experiment was done using the cyclamate-saccharine mixture. There is, therefore, a slight possibility that saccharine is involved.

It is recommended, for the continuing evaluation of the carcinogenic potential of cyclamates, that any tissues available from past chronic tests be reexamined for evidence of neoplastic change, especially in the urinary bladder. Further, it is urged that epidemiological studies be conducted to ascertain what effects, if any, might have accrued from consumption of cyclamates.

Neither the report nor any evidence in the record shows that any member of the Ad Hoc Committee disagreed with the report's contents. None expressed the belief that the scientific data presented to the Committee was inadequate for evaluation, or that the Committee had insufficient time to evaluate the data and prepare its report.

The report was sent formally to the government by the President of the National Academy of Sciences. In an October 24, 1969, cover letter addressed to the Commissioner of the FDA, he wrote,

The brief statement enclosed is the official report of the ad hoc Committee on Nonnutritive Sweeteners convened by the National Academy of Sciences-National Research Council to examine additional information concerning the carcionogenicity of cyclamates in materials intended for human consumption. On the basis of my discussions with the chairman of the Committee, I would like to add the following comments.

1. It will be evident that the opinion rendered by the Committee rested entirely on the evidence presented. The technical judgment was primarily that of the independent pathologists who examined the tissue specimens. Our Committee endorsed the design of the experiments and the conclusion that the incidence of neoplastic changes in the bladders of the affected animals was, statistically, highly significant and clearly the consequence of the ingestion of cyclamates or their metabolic derivative, cyclohexylamine.

2. In its consideration of the evidence presented the Committee noted that such lesions were encountered only in the bladders of those rats at the highest test level; a level which scales up to the equivalent of about a quarter-pound of cyclamate per 70 kilogram human adult per day, if such scaling is valid by simple extrapolation.

No lesions were found at the next lower level of testing. Although the test was on an insufficient scale to indicate that truly, at that level, cyclamate ingestion is entirely without pathological consequence, it should be noted that if the usual rule of thumb is applied, and ingestion at the level of one percent of the safe dose is acceptable, the latter corresponds to the amount of cyclamate ordinarily used in about two cups of coffee.

3. However, the Committee wishes also to note that, by the terms of the law, cyclamates should be excluded from use in foods. Furthermore, the Committee has stated that any use, including that in drug preparations, should be permitted only when the expected benefit from such use decidedly overrides the potential hazard.

4. Without reference to the present circumstances, the Committee urges that revision of governing legislation (the Delaney Amendment [21 U.S.C. § 348(c)(3)(A)]) be seriously considered since it now forbids use, regardless of the relationship between the level of dosage in such use and that required for carcinogenicity, and is binding if such lesions are found in any animal species.

The Committee recognizes that formulation of more appropriate ground rules would be a formidable task, but suggests that the importance and difficulty of this task warrants its early attention.

5. Finally, the Committee also commends the Abbott Laboratories for the dispatch with which they brought their new findings to the attention of the Food and Drug Administration.

Dr. Julian Coon, Chairman of the Ad Hoc Committee, received a copy of the Academy President's October 24, 1969, letter shortly after it was written. There is no evidence that before the trial of this case, Dr. Coon expressed any disagreement with the letter's contents, particularly that portion of the letter which stated that the bladder cancer was "clearly the consequence of the ingestion of cyclamates...."

Scientific material which had been provided to the Ad Hoc Committee for its consideration included data previously furnished to the Surgeon General and the Commissioner of the FDA by Dr. James Price of Abbott Laboratories, under a cover letter dated October 16, 1969. Abbott Laboratories, the manufacturer of cyclamates and plaintiff's supplier, sponsored a number of scientific experiments designed to test the safety of cyclamates; cyclohexylamine, a metabolite or conversion product of cyclamates; and a mixture of ten parts cyclamates to one part saccharin.

The first item Dr. Price provided was the preliminary results of a cyclamate pellet implant study conducted by Dr. George T. Bryan of the University of Wisconsin using cyclamates provided by Abbott Laboratories. In June of 1969, Dr. Bryan had presented this data to Dr. Price and other representatives of Abbott Laboratories, and it was discussed at the meeting of the Ad Hoc Committee. The implant technique involved the surgical implantation of a pellet containing cyclamates into the bladders of laboratory animals, and showed a statistically significant incidence of cancer in the bladder of the animals which received the pellets.

The second set of data reported a two-year chronic toxicity study in groups of rats maintained on diets containing cyclohexylamine sulfate conducted at Industrial Bio-Test Laboratories beginning in May 1967. Cyclohexylamine is a metabolite of cyclamates. In this study, sponsored by Abbott Laboratories, a bladder tumor like the ones found in the Bryan study was identified in one of the laboratory animals.

The third set of data Dr. Price sent covered the preliminary results of a chronic toxicity study sponsored by Abbott Laboratories. The study was conducted at the Food and Drug Research Laboratories and is sometimes referred to as the "Oser study." This experiment tested the effects of a mixture of ten parts cyclamates to one part saccharin on laboratory animals. The results of the Oser study made available to the Ad Hoc Committee showed that eight animals had developed bladder cancer from the test substance like the cancer discovered in the Bryan and Industrial Bio-Test studies.

Aside from the experimental data, the government scientists also were aware that saccharin, which was 1/11 of the cyclamate-saccharin mixture fed to the animals in the Oser study, had a history of safe use.

Abbott Laboratories issued a press release which stated that the company was "in full accord with the general recommendations of the Secretary of Health, Education and Welfare issued today that the use of cyclamate-based artificial sweeteners should be restricted." The press release, in pertinent part, continued:

> About a week ago, Abbott received preliminary information about new animal data which appeared to be inconsistent with previous knowledge about the safety of cyclamate. "Upon its receipt," Mr. Cain [Chairman and Chief Executive Officer of Abbott] said, "we promptly presented this new data to the National Institutes of Health, the Food and Drug Administration, and the National Academy of Sciences, and others in the Department of Health, Education and Welfare."

Nothing in Abbott's press release or in the record of this case indicates that any of its officials or scientists disagreed with the regulatory action taken by the government or with the statements of government officials.

This reference case prosecuted by California Canners and Growers Association (CCG) seeks compensation for business losses it attributes to the foregoing government actions that resulted in deprivation of cyclamates in the processing of fruits and vegetables for marketing on behalf of its members. The hearing officer concluded that CCG has an equitable claim against the United States based on the government's moral obligation to compensate the plaintiff, and that CCG suffered sales losses as a result of the government's activities relating to cyclamates in October 1969. The hearing officer concluded the losses were attributable to the government because there is no other explanation for the decline in CCG's sales after October 1969, and a poll shows that consumers stopped purchasing CCG's products because of the October 1969 activities.

The October 1969 government activities at issue fall into two categories. First was the removal of cyclamates from the FDA's GRAS list. The hearing officer concluded that this regulatory action was proper because the scientific evidence established that cyclamates were no longer generally recognized as safe. No exceptions were taken to this conclusion and the review panel accepts it and addresses it no further. The second activity was the government's publicity that cyclamates were found to cause cancer in laboratory animals. The hearing officer concluded the government's characterization of cyclamates as carcinogenic was erroneous because there was no support in the scientific evidence.

The damages to CCG arising from all October 1969 governmental actions involving cyclamates were calculated by the hearing officer to be 57 percent of all losses due to accumulated inventory, including related expenses, alleged by CCG in these proceed-

ings, or $6,395,339. The hearing officer ruled the government is responsible for the entire amount because it is not possible to separate the damages arising from the change in cyclamates' GRAS status, for which the government is not liable, from the damages arising from the carcinogenicity publicity, for which the government is liable.

Defendant filed exceptions to the hearing officer's report in which it disagreed with the conclusion that the carcinogenicity publicity was erroneous, said there is no causal relationship between the publicity and the award recommended, and questioned the definition of an equitable claim against the government.

## Discussion

### A.

■ The Secretary may not issue regulations prescribing the approved use of any additive "if it is found, after tests which are appropriate for the evaluation of the safety of food additives, to induce cancer in man or animal...." 21 U.S.C. § 348(c)(3)(A). This statute contemplates carcinogenicity known at the time an application for approval is filed, but it is undisputed that the Secretary has a statutory obligation to declare unsafe approved products that are subsequently found to endanger public health and safety. *See Pharmaceutical . Manufacturers Association v. FDA*, 484 F.Supp. 1179, 1182 (D.Del.1980); *see also United States v. Diapulse Corp.*, 457 F.2d 25, 28 (2d Cir.1972). The FDCA does not specify the amount of evidence or degree of certainty necessary to conclude that a substance "induce[s] cancer in man or animal." Therefore, in the absence of irrefutable scientific proof, the Secretary inevitably must exercise discretion in drawing inferences from the information available and taking the appropriate action. *See* 21 U.S.C. § 348(c)(5)(A–C). The public statements of the Secretary and other officials here followed the accepted practice of explaining regulatory action to inform the public of measures to protect health and safety, explained the evidence from which it was inferred that cyclamates cause can-

cer in animals, and may be viewed as part and parcel of the concededly appropriate removal of cyclamates from the GRAS list.

■ Judicial review of discretionary executive actions traditionally has been limited. *See Fidelity Federal Savings & Loan Association v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *United States v. Shimer*, 367 U.S. 374, 381, 81 S.Ct. 1554, 1559, 6 L.Ed.2d 908 (1961); *Cardillo v. Liberty Mutual Insurance Co.*, 330 U.S. 469, 477, 67 S.Ct. 801, 806, 91 L.Ed. 1028 (1947); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Judicial deference is most pronounced when the discretionary activity falls within the expertise of an executive or agency or when the action taken or inference drawn is based on established facts. *See American Ship Building Co. v. NLRB*, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965); *Cardillo*, 330 U.S. at 478, 67 S.Ct. at 806; *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 739, 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945).

Deference does not mean rubber stamp approval of administrative discretion. *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). But "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involves questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of the opinion that his action was clearly wrong." *Shimer*, 367 U.S. at 382, 81 S.Ct. at 1560, quoting *Bates & Guild Co. v. Payne*, 194 U.S. 106, 108, 24 S.Ct. 595, 596, 48 L.Ed. 894 (1904). Otherwise courts presume the correctness and regularity of the administrative action. *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823.

■ In evaluating administrative action, this court must consider whether the government officials substantially complied with the statutes and regulations, the action was arbitrary or capricious, there was

substantial evidence supporting the decision or action, *Morrow v. United States*, 647 F.2d 1099, 1102, 227 Ct.Cl. 290 (1981), and the officials acted beyond the scope of their authority. *See Citizens to Preserve Overton Park*, 401 U.S. at 415–17, 91 S.Ct. at 823–24; *see also Lead Industries Association v. E.P.A.*, 647 F.2d 1130, 1145 (D.C. Cir.1980). There is no exception before the panel of statutory, regulatory, or procedural violations or that the health officials acted outside their authority, so we address only the basis for the contested statements.

■ Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), even if two inconsistent conclusions might be inferred from the same evidence. *See Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026, *NLRB v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942). Therefore, administrative action cannot be overturned simply because a court would have reached a different conclusion. *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304, 97 S.Ct. 576, 580, 50 L.Ed.2d 494 (1977); *Ami-Chanco, Inc. v. United States*, 576 F.2d 320, 326, 217 Ct.Cl. 76 (1978).

The expert scientific Ad Hoc Committee which reviewed the Oser study and the other two studies advised that the evidence "strongly" suggested that cyclamates or cyclohexylamine were the active substances. None of the studies proved with scientific certainty that cyclamates cause cancer; indeed recent studies apparently suggest they do not. But at that time, 1969, the experts unanimously suspected cyclamates as the carcinogen. They discounted saccharin as a carginogen given its long history of safe useage. Indeed, the record shows that diabetics had been using saccharin for over 70 years and had a lower incidence of cancer than the general population.

The government officers did not have the luxury of deferring action and explanation indefinitely. Hesitation might have had pervasive adverse effects on the health of countless people. They made public statements based on scientific evidence that laboratory animals subjected to high doses of mixtures composed primarily of cyclamates had developed cancers. In concluding that cyclamates cause cancer in animals, the officials were exercising their congressionally delegated discretion. Tellingly, at the time of the publicity, the sole basis for the hearing officer's finding of liability, no scientist with knowledge of the information available to the government objected to the publicity. Abbott Laboratories, the manufacturer of cyclamates, also was fully aware of the scientific data and took no exception to the publicity.

The hearing officer believed the Oser study was the sole basis for the government's action against cyclamates. That study established the carcinogenicity of the test substance, a 10:1 mixture of cyclamates and saccharin, but the hearing officer found that no conclusion could be drawn about the carcinogenicity of either of the two ingredients. This conclusion was apparently based on the testimony of three witnesses at trial, two of whom, Doctors Coon, the chairman of the Ad Hoc Committee, and Umberto Saffiotti, a cancer pathologist at the National Cancer Institute, were on the scene in 1969 and registered no objection to the characterization of cyclamates as a carcinogen. It was Dr. Coon's committee that reported in October 1969 that the "evidence strongly suggests that cyclamate or cyclohexylamine is the active substance...." He also received a copy of the letter from the president of the National Academy of Sciences covering the transmittal of the Ad Hoc Committee's report which said that based on discussions with the chairman, Dr. Coon, the bladder cancer reported in the evidence presented to the Ad Hoc Committee was "clearly the consequence of the ingestion of cyclamates or their metabolic derivative, cyclohexylamine."

■ This recitation manifests that the conclusion and statements of the Secretary and other officials that cyclamates are carcinogenic in animals was not arbitrary or unreasonable when made. The scientific experts thought cyclamates were the likely culprit and it was not unwarranted for the officials charged with the responsibility of protecting the public health and welfare to draw the logical conclusion. Though not scientifically verifiable, the conclusion was sufficiently supportable in the context of detailed expositions fully disclosing to the public the information then available.

Substantial evidence underlay the statements, even though the same information might have supported a different assessment. In fact, we are told the process of definitively establishing the safety or carcinogenicity of cyclamates continues today, nearly two decades after these events. In common with other decision makers, however, these officers were required to take the best evidence and advice then available, and in the exercise of their discretion act on it and explain their conclusions and reasons. Their statements were merely an articulation of the reasons for withdrawing cyclamates from the GRAS list. They complied with at least the spirit of court decisions that require clear and complete explanations of administrative action. *See, e.g., Atchinson, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

The statements about carcinogenicity were factual inferences deserving of great deference unless a clear error of judgment is shown. *See NLRB v. Brown*, 380 U.S. 278, 290, 85 S.Ct. 980, 987, 13 L.Ed.2d 839 (1964); *Cardillo*, 330 U.S. at 477, 67 S.Ct. at 806. This plaintiff has not done. In the absence of compelling reasons, it is impermissible for a court to substitute its judgment for that of the responsible officers, *Bayside*, 429 U.S. at 304, 97 S.Ct. at 580; *Ami-Chanco*, 576 F.2d at 326, 217 Ct.Cl. 76, even in a congressional reference. The panel concludes that the statements were not arbitrary, capricious, or lacking in support.

## B.

■ Even if it were otherwise, and the public statements about the carcinogenicity of cyclamates were actionable, plaintiff established no connection between the statements and the recommended award. The sole link found between the carcinogenicity publicity and CCG's losses was a consumer poll assertedly showing consumer reaction to the publicity adverse to products containing cyclamates. That poll, however, is not supportable evidence that the carcinogenicity publicity caused the losses. It was not conducted scientifically; only housewives were interviewed, thereby excluding men and women working outside the home; it excluded persons who purchased low calorie products solely for medical reasons, about 35 percent of CCG's customers; it was limited to only 100 housewives in four markets with high consumption levels of low calorie products; and it warns that the results cannot be extrapolated to the national population. The poll posed questions about cyclamates and low calorie canned fruits generally, but it did not specify CCG or its products containing cyclamates. In addition, 87 percent of the respondents to the poll had never purchased products like those marketed by CCG. Essentially, the causal relationship plaintiff espouses is based only on the answers of 13 percent of the respondents, 52 housewives, who participated in an admittedly unscientific and flawed poll.

Of CCG's losses, the hearing officer found $6.4 million worth were caused by all October 1969 government actions and announcements, both those that were correct and those that were not. Plaintiff had the burden of establishing both causation and the amount attributable to it, but failed to differentiate between losses caused by the appropriate actions of the government, removal from the GRAS list and withdrawal of products, and the purportedly wrongful excerpts about carcinogenicity. The hear-

ing officer recognized the deficiency and sought to accommodate it by "construing the absence of appropriate evidence against the party whose actions gave rise to the harm," and by employing a "jury verdict," held the government liable for the full amount.

▊ Jury verdicts are acceptable when it is not possible for a plaintiff to prove damages with mathematical precision and sufficient evidence is available for a court to come up with a fair approximation. *Specialty Assembly and Packing Co. v. United States,* 355 F.2d 554, 572, 174 Ct.Cl. 153 (1966). "When plaintiff is prevented from specifically proving its damages for reasons beyond its control, ... a court may use a 'jury verdict' to determine the amount of recovery if the evidence is sufficient for a fair and reasonable approximation." *Salem Engineering and Construction Corp. v. United States,* 2 Cl.Ct. 803, 808 (1983); *Joseph Piccard's Sons Co. v. United States,* 532 F.2d 739, 742, 209 Ct.Cl. 643 (1976); *W.R.B. Corp. v. United States,* 183 Ct.Cl. 409, 425 (1968); *Western Contracting Corp. v. United States,* 144 Ct.Cl. 318, 334 (1958). Plaintiff did not adduce this evidence and the hearing officer therefore had no foundation upon which to base an award. *See* RUSCC, App.D, ¶ 8.

### C.

▊ In a case referred by Congress, we must decide whether the plaintiff's "demand is a legal or equitable claim or a gratuity." 28 U.S.C. § 2509(c). Having found no legal basis, the hearing officer concluded there was a cognizable equitable claim.

The word "equitable" in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part. *Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949). *See generally Glosser, Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am.U.L.Rev. 595, 617–25 (1976). This view, however, has eroded

over the years and more recent cases have adopted the rule that the United States must commit some "wrong" in order to incur liability under an equitable claim. *The Innocent Victims of the Occupation of Wounded Knee, South Dakota v. United States,* Cong.Ref. No. 4–76, slip op. at 31 (Ct.Cl. June 10, 1981) (LYDON, T.C.); *see also Webb v. United States,* 192 Ct.Cl. 925, 932 (1970); *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 342–43, 180 F.Supp. 386, 390 (1960). "An equitable claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of governmental employees, any award herein would be a gratuity." *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. November 23, 1977) (LYDON, T.C.); *see also Kochendorfer v. United States,* 193 Ct.Cl. 1045, 1055 (1970). Thus, in order to recover under an equitable claim theory a claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant.

*Shane v. United States,* 3 Cl.Ct. 294, 304 (1983), *adopted,* Cong.Ref. No. 1–79 (Cl.Ct. Nov. 1, 1983); *accord, Sea-Gate, Inc. v. United States,* 4 Cl.Ct. 25, 30 (1983), *adopted,* Cong.Ref. No. 2–76 (Cl.Ct. Aug. 20, 1984).

Our preceding discussion shows that there was no wrongdoing on the part of government officials and employees, so the essential ingredient for a recommendation of an equitable award to plaintiff is lacking. Therefore, we need not reach defendant's further argument that notwithstanding any wrongdoing the government is not liable unless the fault would also be actionable against a private party, which the hearing officer held was not the case here. *Compare, e.g., Burt v. United States,* 199 Ct.Cl. 897, 906 (1972), and *Armiger v. United States,* 339 F.2d 625, 628, 168 Ct.Cl. 379 (1964), *with, e.g., Burt,* 199 Ct.Cl. at 919 (Harkins, J., concurring), and *Kure*

*Beach v. United States,* 168 Ct.Cl. 597, 623, 626 (1964).

■ The panel also rejects plaintiff's argument that it is entitled to the recommended award even if the government did not act wrongfully. Plaintiff says, "The foundation of the no-fault approach to equitable claim cases lies in the concept that in some instances as a matter of broad equitable considerations, the Government has a moral obligation to compensate an individual for losses which it has caused." Recognizing that some differences of opinion on this issue exist in the court and earlier cases, this panel nevertheless agrees with the view set out in *Merchants National Bank v. United States,* 7 Cl.Ct. 1, 9, and n. 6 (1984), that a recommendation of award without fault would be "erroneous as a matter of law."

### Conclusion

Accordingly, the review panel recommends that the Chief Judge advise the Senate that plaintiff, California Canners and Growers Association, does not have a legal or equitable claim against the government and that any award would be a gratuity.