**Donald W. SNEEDEN, Mary S. Sneeden, Henry C. Best and Lincoln Construction Company, Plaintiffs**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 92–865X.**

United States Court of Federal Claims.

April 27, 1995.

---

**16.** Tr. at 196, 217–218; *see also* Def.Ex. 23 at 519.

John L. Napier, Washington, DC, attorney of record, for plaintiffs; Hugh R. Overholt and Chrys D. Lemon, of counsel.

Franklin E. White, Jr., Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant.

Before the Review Panel, KENNETH R. HARKINS, Senior Judge, JAMES T. TURNER and DIANE GILBERT WEINSTEIN, Judges.

## REPORT OF THE REVIEW PANEL

HARKINS, Senior Judge.

The House of Representatives in H.Res. 568, on October 4, 1992, referred to the United States Claims Court[1], a private bill, H.R. 6012, a bill for the relief of Donald W. Sneeden, Mary S. Sneeden and Henry C. Best. The hearing officer has conducted an investigation, including a trial from January 18–22, 1994, and has filed a report. *Sneeden v. United States,* 31 Fed.Cl. 671 (1994). The hearing officer has determined the facts and concluded that an award to plaintiffs would be a gratuity. Plaintiffs' exceptions to the hearing officer's findings and conclusions have been briefed and oral argument was heard on January 30, 1995. The review panel has considered plaintiffs' exceptions to the findings and conclusions, and on the basis of the entire record, adopts the hearing officer's report. The House of Representatives is

---

1. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), renamed the court the United States Court of Federal Claims, effective October 29, 1992. This change did not have legal consequence in the congressional reference statutes.

advised that any payment to plaintiffs would be a gratuity.

\* \* \* \* \* \*

H.R. 6012 involves a claim for damages by plaintiffs, who are stockholders and officers of Lincoln Construction Co., Inc. (Lincoln), a subcontractor in a project of the Army Corps of Engineers (Corps), the Wilkerson Creek Bridge Replacement Project in Hyde County, North Carolina (Project). The Project involved the construction of a new fixed-span bridge over the Atlantic Intercoastal Waterway with an in-place earth embankment as an approach to each side of the bridge.

Plaintiffs' claim in H.R. 6012 arises from negotiations in 1986 that culminated in an agreement dated June 5, 1986, between the United States and the prime contractor, on behalf of Lincoln, that released the Government from all claims arising out of the contract for the Project. H.Res. 568 includes the following:

(b) In conducting its proceedings concerning H.R. 6012 in accordance with section 2509 of title 28, United States Code, the United States Claims Court may recommend the payment of money under the bill, notwithstanding provisions in an agreement dated June 5, 1986, between the United States and the contractor, J. Lawson Jones Construction Co., Inc., on behalf of its subcontractor, Lincoln Construction Company, Inc., that the contractor agreed to release the Government from all claims arising out of the contract dispute and that the agreement constituted a full accord and satisfaction of all the contractor's claims against the United States. In determining whether such provisions in the agreement should bar the award of any additional money, the Claims Court shall determine whether the United States acted in bad faith in settling the claim, knowing that at the time of the settlement negotiations Lincoln Construction Company, Inc., because of its obligation to pay debts pursuant to a bankruptcy proceeding, was constrained to accept even an unreasonable settlement offer.

The prime contract for the Project was awarded on February 14, 1978, to J. Lawson Jones Construction Company, Inc. (Jones).

The prime contract was a formally advertised procurement for an estimated amount of $4.2 million. Lincoln's subcontract, in the amount of $1.3 million, was for the entirety of the earthen embankment work.

Contract specifications required the bridge embankments to be constructed to a height of approximately 45 feet. Construction for the roadways forming the approaches to the bridge required over 325,000 cubic yards of in-place earth. Prior to bidding the Project, Lincoln reviewed the plans and specifications. Lincoln also made a site investigation, which was conducted by Lincoln's president, Mr. D.S. Sneeden.

The Corps' design for the project was based upon a design by the North Carolina Department of Transportation (NC DOT). The NC DOT design had provided for an embankment 30 feet high. The Corps modified this design in response to a value engineering proposal by increasing the embankment heights and shortening the length of the bridge. The Project involved the first bridge in the lowlands of eastern North Carolina with an embankment greater than 40 feet in height. Lincoln's bid on the IFB was based on the design specification as changed. Lincoln learned, after filing a Freedom of Information Act request, that the design had been changed in response to a value engineering proposal.

The Notice to Proceed was issued to Jones on March 9, 1978, and the completion date for all contract work was 720 days later, February 27, 1980. Lincoln began work in March 1978 as a subcontractor. Both Jones and Lincoln anticipated the embankment work would be completed in approximately 6 months, by December 1, 1978.

Lincoln encountered problems allegedly as a result of changed site conditions and faulty contract specifications. Work fell behind schedule and resultant economic problems were substantial. After numerous meetings were unsuccessful in resolution of these problems, Lincoln made a formal claim to the contracting officer (CO) in October 1979, which resulted in a final decision of the contracting officer on November 5, 1979, that denied the claims. A timely appeal was

made to the Engineers Board of Contract Appeals (Board) on November 30, 1979. Hearings on the appeal extended for 7 weeks from December 8, 1980, to January 29, 1981. Lead counsel for the Corps was Mr. Alva Hall.

Lincoln completed the embankment work in September 1981. This was 8 months after the Board's hearing on the appeal, and 3½ years after Lincoln commenced performance.

During the period of waiting for the Board's decision, Lincoln's financial situation deteriorated. The surety would not support Lincoln, and Lincoln was unable to secure other contracts because it could not be bonded. These conditions allegedly forced Lincoln and Lincoln Development Company, Inc. (Development) to file bankruptcy proceedings in 1982 under Chapter 11. Development, also an asset of Mr. Sneeden, was engaged in real estate development. Both Lincoln and Development were in financial difficulty and the principal asset in the bankruptcy proceedings was Lincoln's claim against the Government.

The Board announced its decision on February 27, 1986, and reconsideration was denied on June 17, 1986. Lincoln prevailed on all liability issues, 5 and ½ years after the hearing and 6 and ½ years after its appeal to the Board. The Board remanded to the CO all matters of quantum for negotiation of a contract adjustment.

The CO for the Corps' Wilmington District during quantum negotiations was Colonel Wayne Hanson. The Corps designated Mr. Hall to negotiate the quantum issue. Mr. Hall considered the Board's decision to have been wrongly decided, and he wanted to try the quantum portion of Lincoln's claim before the Board. He believed that the Government had defenses to the quantum issue, and this belief determined his beginning point for the quantum negotiations.

Quantum negotiations required five sessions during the period February 27 to May 26, 1986, prior to execution of the settlement agreement by the CO on June 5, 1986. The negotiations involved claims of both Jones (approx. $1.5 million, plus interest) and Lincoln (approx. $5.49 million, plus interest). At the first negotiating session the Jones claim was settled for $810,000, including interest.

Lincoln's negotiations were based both on cost claims that had been submitted on June 9, 1982, after post-hearing briefs had been filed in the Board proceedings, and the Corps' audit report, dated April 11, 1983. The 1983 audit concluded that Lincoln's claim totaled $2,572,028, but the parties were unable to agree on the accuracy of the audit. As revised for the 1986 quantum negotiations, Lincoln contended the audit reflected a claim that totaled $3,543,340.

At the first negotiating session on February 27, 1986, the parties discussed interest rates applicable to the claim. Mr. Hall contended the interest period should be March 1, 1979, through February 27, 1986. Based on a standard rate for this period, the interest rate would be 12.29 percent; through 6 years the interest allowed would amount to 73.74 percent of the costs claimed, and through 7 years, the interest allowed would be 86.03 percent of the costs claimed. Lincoln initially based its interest calculation on the Contract Disputes Act (CDA) and used in the negotiations a rate that provided 85 percent. The CDA interest provision is not applicable; interest was payable only from the date of appeal of the CO decision to the date of the Board's decision. The parties treated the 70 percent interest rate as acceptable. This rate was discussed and used in the April 2, and May 19, 1986, negotiation sessions without objection by plaintiffs.

The hearing officer noted that the Corps' internal documents supported an interest rate of 79.98 percent, and that the Corps' calculations of 79.98 percent did not reflect the amount to which plaintiffs were entitled, as Mr. Hall had argued in the first negotiations. Before the hearing officer, and in their exceptions to the report, plaintiffs state there was no agreement on the 70 percent calculation. The hearing officer concluded that plaintiffs' acceptance of the 70 percent calculation was not involuntary or under duress and their failure to attempt to negotiate a change in the 70 percent calculation during 3 months of negotiations showed its acceptance. The hearing officer's conclusion is supported fully by the record.

In the first negotiation session, Mr. Hall initially offered either $1 million or $1.2 million to settle Lincoln's claim; plaintiffs' counteroffer was for $8 million. Both offers were made as a starting point with knowledge that neither would be accepted.

The final settlement amount agreed upon at the May 26, 1986, session between Colonel Hanson and Mr. Sneeden was $4,324,505, including interest. That amount also included additional interest of $24,000. The additional interest was subject to reduction of $400 per day for each calendar day that payment is made before the expiration of a 60–day period from June 5, 1986. Payment was made on July 21, 1986, in the amount of $4,319,305, which included additional interest in the amount of $19,305, for the period June 3, 1986, to July 21, 1986.

Throughout the quantum negotiations, plaintiffs viewed Mr. Hall as arrogant, belligerent and biased because of a desire to avenge his loss before the Board on Lincoln's appeal. Representative Charlie Rose, in March 1986, after the first negotiation session, interceded on Lincoln's behalf and requested that Mr. Hall be removed as the Corps negotiator. Although Mr. Hall was not removed from the Corps' negotiating team, he did not attend any of the subsequent sessions.

With respect to Mr. Hall's impact on the settlement negotiations, the hearing officer concluded:

—Mr. Hall's initial low offer did not constitute bad faith;

—Mr. Hall's offer of $3.5 million with a 24 hour deadline for acceptance, if it were coercive when made, such impropriety was overcome by the Corps' agreement to allow 30–60 additional days for discussions with the surety, and Lincoln's acceptance of 30 days.

—There was no evidence to support plaintiffs' contention that the Corps' negotiation team was "tainted" by Mr. Hall's continuing malice toward Lincoln and his disappointment over losing the liability issues.

The June 5, 1986, settlement agreement, in addition to the monetary payment on behalf of Lincoln, includes:

—agreement to release the Government from all claims, appeals, rights of action and suits arising out of or under the contract for the Project;

—agreement that it constituted a full accord and satisfaction of all claims and is a reasonable settlement of all issues and appeals; and

—release of all claims to attorneys' fees and other expenses arising under the Equal Access to Justice Act.

Subsequent to the settlement, Lincoln was required to petition the Bankruptcy Court for approval of the settlement. Lincoln's petition contained the following language:

The debtor believes the settlement summarized herewith and set forth through greater specificity in the attached document is in the best interest of the debtor, creditors and all parties in interest and seeks approval of the bankruptcy court for its implementation.

In addition to findings of fact and conclusions about the merits of plaintiffs' claims, the hearing officer addressed specifically the issue of whether the United States acted in bad faith in the quantum settlement negotiations. The hearing officer found that Col. Hanson was responsible during all sessions after negotiations were resumed on April 2, 1986, and that the parties agreed he was sympathetic to plaintiffs. Col. Hanson believed the $4.3 million amount was fair. He negotiated an additional $800,000 for plaintiffs; he went to Washington after the May 26 agreement to assure payment within 60 days. He advised Mr. Sneeden to accept the offer because, after his then pending transfer to Alaska, a new district engineer would be unfamiliar with Lincoln's case. The hearing officer concluded that Col. Hanson wished to expedite the settlement to help Mr. Sneeden. The hearing officer concluded Col. Hanson was a credible witness and that his testimony was convincing that no effort was made to force Mr. Sneeden to reject or accept the settlement proposal. The hearing officer accepted Col. Hanson's testimony that the Corps was not pressuring him to push for settlement.

With respect to whether the Corps' treatment throughout the contract period caused Lincoln's bankruptcy, the hearing officer concluded that other factors may have contributed to Lincoln's demise. The record shows the interrelationship between Lincoln Construction and Lincoln Development caused auditing difficulties. During the 1983 audit period Lincoln Development had heavy debt service for real estate purchases. Lincoln Construction made interest-free loans to Lincoln Development during that period. Also, there was testimony that Mr. Sneeden received over $250,000 in accrued salary from Lincoln Construction.

The hearing officer concluded that the facts in the record do not support a finding of bad faith by the Government. The settlement amount reasonably represents the fair value of plaintiffs' claim. On the facts in the record, the superior legal and financial resources of the Government were not used to coerce a weak but successful litigant into an unfair settlement.

\*    \*    \*    \*    \*    \*

Plaintiffs' exceptions to the hearing officer's report are:

I. The hearing officer committed legal error and incorrectly interpreted the congressional reference statute (28 U.S.C. § 2509) when he relied on supplemental language in H.Res. 568 as altering the statutory standards.

II. The hearing officer failed to address evidence that demonstrated Lincoln was forced to execute the settlement agreement and release under economic duress.

III. The hearing officer's determination of "bad faith" by resort to a generic definition in Black's Law Dictionary that contained a requirement to find "malice" or a "design to defraud" was based on a clearly erroneous standard. The hearing officer failed to recognize Federal Circuit precedent that broadens the "bad faith" standard to include governmental action or inaction that harms a private party but may not be accompanied by malice or a specific intent to injure, and adopts the requirements of good faith and fair dealing for contract performance.

## I.

H.Res. 568 requested a determination of whether the terms of the June 5, 1986, release and settlement should bar the award of any additional money, and specifically requested in that connection a determination of whether the United States acted in bad faith in settling the claim in consideration of knowledge then available. Plaintiffs recognize that a reference resolution properly may ask for additional information about actions in bad faith. Plaintiffs contend, however, that the hearing officer treated the request for a bad faith determination as a condition precedent for consideration of a pattern of government wrongdoing and in so doing misinterpreted and misapplied the congressional reference statutes. Plaintiffs fail to recognize (1) that the additional language in H.Res. 568 did not change the statutory standard, and (2) that the hearing officer did not limit his inquiry to an examination of bad faith or improperly confine his focus to the CO's conduct.

The congressional reference statutes authorize either body of Congress to refer a bill, except a bill for a pension, to the Chief Judge of the Court of Federal Claims for a report. 28 U.S.C. § 1492 (1988). When a bill is referred, the Chief Judge must designate one of the judges of the court as a hearing officer, and a panel of three judges to serve as a reviewing body. The hearing officer is directed to determine the facts, including facts relating to delay or laches, facts bearing upon the question of whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimants for not having resorted to any established legal remedy. The hearing officer also is directed to append to the findings of fact, conclusions sufficient to inform Congress whether the demand is a legal or equitable claim, or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant. The statute does not require information as to any amount of compensation to be reported for a gratuity. 28 U.S.C. § 2509.

The court's obligation in a congressional reference case is founded on statutory law. 28 U.S.C. §§ 1492, 2509. Language added or

omitted in the reference resolution, or addition of supplementary language by one House of Congress at the time the reference resolution is under consideration, does not have the force and effect of an amendment to the basic law. It can neither add to nor subtract from the requirements of the reference statute.

There are several reasons for a House of Congress to refer bills for private claims, and thus defer action until a report is received: (a) the facts and the applicable law are complex and the matter can be illuminated through a court proceeding; (b) the claim should be established by competent evidence, as evaluated by a court; (c) the cognizant congressional committees lack the time, facilities, and expertise necessary to hear the evidence and make determinations on the issues; (d) trial proceedings may be needed, which may be protracted and held in locations other than Washington, D.C. Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective*, 25 Am.L.Rev. at 605.

The function of the congressional reference procedure that is most beneficial to Congress is the clarification and determination of the many tenuous and frequently complex facts that a claimant alleges to apply to equities in the claim. The facts, once clarified, provide a basis on which Congress can predicate action on the bill referred, or on a substitute bill in a later Congress.

The report to Congress on the bill referred is advisory, and any conclusions as to whether the claim is legal or equitable, and any conclusions as to compensation due, are recommendations only. In each case, the facts are *sui generis*. *Merchants Nat'l Bank of Mobile v. United States*, 7 Cl.Ct. 1 (1984). Inasmuch as the conclusions are recommendations, as distinguished from judicial judgments, the court-made rules of *stare decisis* and *res judicata* do not apply. Congressional reference cases have no binding value as precedent.

█ In the application of the congressional reference procedure, certain elements are constant. An "equitable claim" is not reported unless the facts create an obligation that the United States should recognize.

The obligation may arise from some unjustified government acts that caused damage to the claimants, *Merchants Nat'l Bank*, 7 Cl. Ct. at 9 n. 6; *Wounded Knee Innocent Victims v. United States*, Cong. Ref. No. 4–76, December 15, 1981, synopsis at 229 Ct.Cl. 465 (1981); *Wong v. United States*, Cong. Ref. No. 3–74, p. 12–13, Nov. 23, 1977, *rev'd on other grounds by Review Panel*, May 16, 1979, synopsis at 220 Ct.Cl. 750 (1979), or it may arise when the government acquires benefits through overreaching by its agents or by misleading representations by government agents that are beyond the scope of delegated authority. *Gay Street Corp. v. United States*, 127 F.Supp. 585 (Ct.Cl.1955). In the absence of wrongdoing on the part of government officials and employees, an essential ingredient for a recommendation of an equitable award is lacking. *California Canners and Growers v. United States*, 9 Cl.Ct. 774, 785 (1986).

█ The supplemental request in H.Res. 568 did not change the statutory requirement to report facts sufficient to inform Congress of the amount legally or equitably due from the United States to the claimant. The supplemental language was a request for additional information. It was not language that changed the statutory standards applicable to an equitable claim. The situation is not apposite to that in *Burt v. United States*, 199 Ct.Cl. 897 (1972). There, the supplemental language in the reference resolution added the standard of "good conscience" to the standards of 28 U.S.C. § 2509(c). The panel majority concluded that the supplementary criterion of "good conscience" invoked a standard far broader than standards defining a "legal" claim, or an "equitable" claim, and recommended payment based on consideration of the "good conscience" standard.

Contrary to Lincoln's contention, in this case the hearing officer did not limit his inquiry to the contracting officer's conduct or to actions that define "bad faith." The hearing officer's report establishes that all materials in the record relevant to a legal claim or an equitable claim were considered. The facts, specially found, were set forth in narrative format. There is no requirement that

findings of fact be segregated from conclusions of law or separately numbered. The hearing officer's narrative included: description of project requirements; alteration of the NC DOT original design; plaintiffs' contract performance difficulties; meetings with Senator Morgan's staff and assistance from Representative Charlie Rose; the appeal to the Corps BCA; Lincoln's deteriorating financial situation and the 1982 bankruptcy; the 1983 audit; details of the negotiations for quantum—persons participating, negotiation posture of the parties, sequence of issues addressed, and advice of plaintiff's bankruptcy lawyers; and other factors that may have contributed to Lincoln's demise.

## II.

■ Plaintiffs contend the hearing officer ignored uncontroverted evidence that establishes an equitable claim—namely that Lincoln was forced to execute the settlement agreement under economic duress. The hearing officer focused trial on the issue of whether the United States used its superior legal and financial resources to coerce a weak but successful litigant into an unfair settlement, and concluded that plaintiffs made no showing that anyone acting on behalf of the United States did so maliciously or with a design to defraud. Examination of the record before the hearing officer, including plaintiffs' posttrial brief and proposed findings of fact and defendant's briefs, does not establish that the hearing officer failed to analyze the materials in the record, or that the findings of fact are clearly erroneous. It is apparent that the hearing officer considered and rejected plaintiffs' arguments.

■ Legal duress is not present and there is no equitable basis to set aside the quantum settlement agreement. In order to constitute legal duress: (1) one side involuntarily accepts the term of the other; (2) the circumstances permit no other alternative; and (3) the circumstances were a result of the coercive acts of the opposite party. *Fruhauf Southwest Garment Co. v. United States,* 111 F.Supp. 945, 951 (Ct.Cl.1953). Economic pressure and even the possibility of severe financial loss, however, are not duress. *International Tel. & Tel. Corp. v.*

*United States,* 509 F.2d 541, 549 n. 11 (Ct.Cl. 1975). Furthermore, a claim of economic duress is not substantiated by the making of hard bargain. *Aircraft Associates & Mfg. Co. v. United States,* 357 F.2d 373, 378 (Ct. Cl.1966). The mere stress of business conditions will not constitute duress. Instead defendant must have engaged in some wrongful conduct, or be the cause of plaintiff's plight, in order to shift responsibility for deals made by plaintiff under the stress of financial necessity. *Johnson, Drake & Piper, Inc. v. United States,* 531 F.2d 1037, 1043 (Ct.Cl. 1976); *La Crosse Garment Mfg. Co. v. United States,* 432 F.2d 1377, 1382 (Ct.Cl.1970).

## III.

■ Plaintiffs contend the hearing officer's determination on "bad faith" was based on an erroneous standard that fails to comply with the legal criteria of the Federal Circuit. Plaintiffs argue that a showing of bad faith requires only "action or inaction that harms a private party but may not be accompanied by a specific intent to injure...." Plaintiffs' analysis of the case law that establishes the elements necessary to establish bad faith, case law that is binding in this court, is incorrect.

The lesser standard urged by plaintiffs has not been accepted. Plaintiffs' argument is a curious amalgam of misinterpretation of the Federal Circuit's decision in *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988), which did not address an allegation of bad faith, and an academic analysis of RESTATEMENT (SECOND) OF CONTRACTS § 205 comments (d) and (e). Plaintiffs' analysis appears to be more directed at changing long settled and controlling law than at correcting any misapplication of the law by the hearing officer.

■ The law applicable to an allegation of Governmental bad faith is well-established. "Any analysis of a question of Governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.'" *Kalvar Corp. v. United States,* 543 F.2d 1298, 1301 (Ct.Cl. 1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977), (quoting *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL

7633 (1959)). The hearing officer was required to presume that the Corps officials involved in this matter discharged their duties correctly, lawfully, and in good faith. *Wathen v. United States,* 527 F.2d 1191 (Ct. Cl.1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *Boyle v. United States,* 515 F.2d 1397 (Ct.Cl.1975). That presumption cannot be dislodged until the plaintiff comes forward with "well-nigh irrefragable proof." *Fucik v. United States,* 655 F.2d 1089, 1097 (Ct.Cl.1981); *Sanders v. United States Post Service,* 801 F.2d 1328, 1331 (Fed.Cir.1986).

As the Court of Claims explained in *Kalvar:*

> [i]n the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some *specific intent to injure the plaintiff.* Thus, in *Gadsden v. United States,* 111 Ct.Cl. 487, 489–90, 78 F.Supp. 126, 127 (1948), the court compared bad faith to actions which are 'motivated alone by malice.'

*Kalvar Corp.,* 543 F.2d at 1302. Under precedent binding on the hearing officer, plaintiffs were required to show that Colonel Hanson negotiated an unfair settlement with a "specific intent to injure the plaintiffs."

The hearing officer's definition of bad faith, as defined in BLACK'S LAW DICTIONARY—"the conscious doing of a wrong because of dishonest purpose or moral obliquity"—is no more demanding a standard for a plaintiff to meet than the standard which is the controlling law of the Federal Circuit. It is not in any way unreasonable.

The entire record establishes that neither Col. Hanson nor Mr. Hall acted with a specific intent to injure Lincoln. The record amply shows that Col. Hanson, the ultimate decision maker in negotiation of the settlement, dealt with plaintiffs fairly and honestly.

\*     \*     \*     \*     \*     \*

■ At the January 30, 1995, hearing, the assertions of the parties relative to delivery to plaintiff of the work papers underlying the Corps audit were in conflict. When this conflict was discussed initially, the following colloquy occurred:

JUDGE HARKINS: I've reviewed the post-trial briefs of both parties on this issue and it's certainly my understanding that the ultimate conclusion was that all of the work papers were in fact delivered to you people.

Now, if I'm wrong, you'd better put in a supplemental brief and show me it.

MR. LEMON: All right, Your Honor. We'll do that.

In subsequent statements, the conflict as to this issue was resolved to the panel's satisfaction. No schedule for submission of post argument briefs was established, and there was no order that authorized post argument filings.

On February 7, 1995, plaintiffs delivered to the Clerk a document captioned: Supplemental Filing Reference Improper Withholding of Audit Work Papers by Defendant. On February 8, 1995, an order was entered that directed the Clerk to return the document unfiled. The reason stated was: "Supplemental briefs were not authorized at the oral argument."

On February 17, 1995, plaintiffs filed a motion for reconsideration of the February 8, 1995, order, and submitted for filing a document captioned: Supplemental Filing Reference Improper Withholding of Audit Work Papers by Defendant. The motion for reconsideration was considered by the panel on March 6, 1995.

The issue of plaintiffs' access to the audit work papers was clarified by statements of both parties at argument. For that reason no schedule for filing post hearing briefs was established, and no order was given at the end of argument that authorized additional filings.

Plaintiffs' February 17, 1995, motion for reconsideration is denied.

\*     \*     \*     \*     \*     \*

Plaintiffs' voluntary execution of a settlement agreement that included an accord and satisfaction for all claims, in the light of having failed to take any action in a court to have the settlement agreement set aside, establishes that plaintiffs have no legal claim. Plaintiffs have not shown actions by repre-

sentatives of the United States in the settlement of the quantum issue that gave rise to an obligation for additional compensation. Plaintiffs have shown no unjustified acts that caused damage to plaintiffs, nor have plaintiffs shown the government enjoys benefits through overreaching by misleading representations by government agents. Plaintiffs have not shown entitlement to any equitable claim. On the basis of the entire record, the Review Panel adopts the report of the hearing officer. The House of Representatives is advised that any payment to plaintiffs would be a gratuity.