**Jon HEDMAN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 356–86C.**

United States Claims Court.

Aug. 27, 1990.

Zenas Baer, Hawley, Minn., for plaintiff.

Hillary A. Stern, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This civilian pay case is before the court on cross-motions for summary judgment.[1] Plaintiff, Jon Hedman, was dismissed from his position as an Agricultural Stabilization and Conservation Service (ASCS)[2] County Executive Director (CED) for Clay County in the State of Minnesota. He was relieved of his duties by the ASCS Clay County Committee (COC)[3] "for cause," thereby foreclosing eligibility for severance pay and future federal employment. However, by the present motion for summary judgment, Mr. Hedman asserts that the ASCS "for cause" determination was arbitrary, capricious, an abuse of discretion, and not in accord with the law insofar as the agency actions at issue here are not supported by substantial evidence and failed to meet applicable procedural requirements. In

---

1. Jurisdiction is premised on the Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), which embraces:

   [A]ny claim against the United States founded either upon the Constitution or any Act of Congress, or any regulation of an executive department or upon any express or implied contract with the United States....

2. The ASCS is a duly authorized federal agency acting under the direct supervision of the United States Department of Agriculture. *Hedman v. United States*, 15 Cl.Ct. 304, 312 (1988).

3. The COC is composed of three elected members. At the time relevant to this litigation, those three members were Raymond Grover, Roger Hegland, and Herbert Aakre.

view of this alleged erroneous characterization of the reasons for his termination, Mr. Hedman argues that he should have been dismissed "without prejudice," thereby permitting the recovery of severance pay under the Severance Pay Act, 5 U.S.C. § 5595.[4]

The United States (defendant) has filed a cross-motion for summary judgment, asserting that the "for cause" termination was proper, inasmuch as it was both procedurally correct and supported by substantial evidence. Thus, it avers that Mr. Hedman is not entitled to severance pay in view of his alleged failure to prove that the "for cause" termination was either legally or factually deficient. For the reasons expressed hereinafter, the defendant's motion is GRANTED, and plaintiff's motion is concomitantly DENIED.

*Background*

This case is premised upon certain claims that we first addressed in *Hedman v. United States*, 15 Cl.Ct. 304 (1988). There we observed that Mr. Hedman's petition in this court initially sought to recover monetary relief from the defendant on three different bases: (i) an alleged breach of an implied-in-fact employment contract; (ii) back pay under the Back Pay Act, 5 U.S.C. § 5596; and (iii) severance pay under the Severance Pay Act, 5 U.S.C. § 5595. The defendant responded by filing a RUSCC 12(b) motion to dismiss for lack of jurisdiction. We granted the motion in part because Mr. Hedman failed to allege a sufficient basis for jurisdiction under either of the first two theories.

However, we concluded that the Severance Pay Act *did* confer jurisdiction on this court. In the process, we stated that, in order to recover under that Act, Mr. Hedman was required to show that he was: (i) an employee as defined under the Act; (ii) employed for a continuous period of at least 12 months; (iii) involuntarily separat-

ed from service; and (iv) not removed for cause on charges of misconduct, delinquency, or inefficiency. *Hedman*, 15 Cl.Ct. at 318. After analyzing each of the four elements necessary for a successful severance pay claim, we found that Mr. Hedman was an employee within the meaning of the statute, that he was employed for a continuous period of no less than 12 months, and that he was dismissed involuntarily. *Hedman*, 15 Cl.Ct. at 318. However, we were unable to reach the merits of the severance pay claim because the parties vigorously disputed the propriety of the defendant's determination that Mr. Hedman was properly terminated "for cause."

Therefore, we did not decide whether Mr. Hedman satisfied the fourth statutory element for severance pay. In other words, we did not decide whether or not Mr. Hedman was properly removed "for cause" on charges of misconduct, delinquency, or inefficiency within the meaning of the Severance Pay Act. Rather, that issue was reserved for future proceedings because we determined that the resolution of such a factual question was inappropriate on a motion to dismiss for lack of jurisdiction. Nevertheless, we defined the remaining issue, which is the dispositive issue now before us, in narrow terms as—whether Mr. Hedman's termination was properly characterized as removal "for cause." *Hedman*, 15 Cl.Ct. at 319.

Pursuant to a supplemental order, we further determined that our scope of review in resolving this question must be limited to the administrative record upon which the challenged "for cause" dismissal was premised. *Hedman*, 15 Cl.Ct. at 319. We also delineated the standard of review by which the subject agency actions are to be measured—whether the "for cause" stigma attached to said removal was arbitrary, capricious, an abuse of discretion, not in accord with the law, or otherwise out

---

**4.** The Severance Pay Act, 5 U.S.C. § 5595 (1988), provides in pertinent part:

(b) Under regulations prescribed by the President or such officer or agency as he may designate, an employee who—
(1) has been employed currently for a continuous period of at least 12 months; and

(2) is involuntarily separated from service, not by removal for cause on charges of misconduct, delinquency, or inefficiency;
is entitled to be paid severance pay in regular pay periods by the agency from which separated.

of step with applicable statutory, procedural, or constitutional requirements. *Hedman,* 15 Cl.Ct. at 321. In view of the foregoing, we must now focus our attention on the stipulated administrative record filed with the court and determine whether the defendant acted arbitrarily, capriciously, with an abuse of discretion, contrary to the law, or in a manner that did not otherwise satisfy appropriate statutory, procedural, or constitutional criteria when it separated Mr. Hedman from his post as Clay County CED "for cause."

*Facts*

The following operative facts are gleaned from the administrative record (AR), along with those general facts set out in our previous opinion. Mr. Hedman was continuously employed by the ASCS from 1962 through 1984. He served as the CED in St. Louis County in the State of Minnesota from 1966 through 1975, after which he became the CED for Clay County, also in the State of Minnesota. Mr. Hedman apparently performed his duties as Clay County CED satisfactorily and without incident from 1975 through sometime in the early 1980s.[5]

The problems that are at the root of the subject dispute began to develop in the spring of 1983. On June 20, 1983, the United States Department of Agriculture (USDA), Office of the Inspector General (OIG), completed its annual random audit of the Payment In Kind Program ("PIK"),[6]

a survey which included Clay County for that year. This survey, later designated OIG Audit 399–39CH, reviewed PIK contracts involving farm-stored collateral and purchases of loan collateral from farm and warehouse-stored grain. Among other purposes, the OIG audit was intended to determine whether producers had sufficient collateral to meet PIK requirements and other loan obligations, whether adjustments to loan quantities were accurate, and whether loan settlements were correctly computed.

The OIG audit uncovered certain problems on at least four loans in Clay County, loans under the supervision of Mr. Hedman. The OIG investigator found that two Clay County farm-stored loans, identified as loan numbers 18 and 77, had collateral shortages with apparent unauthorized removals of grain. AR, p. 307. On loan number 77, the OIG findings recommended the assessment of liquidated damages. The OIG also discovered two additional loans, numbers 660 and 448, with collateral that was going out of condition due to mold. AR, p. 305. At the conclusion of the OIG audit, Mr. Hedman was given an exit briefing on the aforementioned deficiencies. AR, pp. 276, 305. Mr. Hedman provided a handwritten response for each of the identified deficiencies,[7] but he apparently did not retain either a copy of the audit or his response. The record further shows that Mr. Hedman failed to inform

---

5. Mr. Hedman received satisfactory performance evaluations for the years 1979 through 1981. Exhibits A–2 through A–5, AR, pp. 324–341. Although the administrative record contains performance evaluations for those three years only, it contains an additional indication that the ASCS County Committee (COC) and District Director (DD) determined that Mr. Hedman performed his duties in a satisfactory manner as late as December 8, 1983. *See* Minutes of the Clay County ASCS Committee Meeting, 12–8–83, AR, p. 156.

6. The regulations governing the PIK program are set out in 7 C.F.R. §§ 770.1–770.6 (1984). In substance it is a program that provided agricultural commodities to participating producers who, in exchange, agreed not to plant certain commodities on designated acreage during that year. *Gibson v. United States,* 11 Cl.Ct. 6, 7 (1986); *see also Raines v. United States,* 12 Cl.Ct.

530, 531–532 (1987); *Hauptricht Bros., Inc. v. United States,* 11 Cl.Ct. 369, 370–371 (1986). The PIK was enacted "to adjust the total national acreage of certain commodities to desirable goals" and to compensate farmers by supplying them with like commodities. 48 Fed.Reg. 1476 (1983), *cited in Gibson,* 11 Cl.Ct. at 7–8.

7. In this report, Mr. Hedman acknowledged that:

   1. Loan # 18 [collateral] was 10% short with questionable authorization to move grain. Corrective action is necessary. ( [Producer] agree[d] by telephone that he did remove grain prior to requesting authorization).
   2. Loan # 77 ... Producer, moved grain early (or an amount of grain) without proper authorization, that is, unauthorized removal.
   3. [L]oans # 448 and 660 needed to be reconditioned.
   AR, p. 276.

the COC of any of the problems raised in the OIG audit in any of the nine COC meetings that took place over the next four months. *See* 6/23, 6/30, 7/14, 7/19, 7/28, 8/11, 8/30, 9/15, and 9/29/83 Clay County Committee Executive Minutes, AR, pp. 163–172. Moreover, the record contains no indication that Mr. Hedman took any individual action to correct the problems identified by the OIG audit during that period.

The formal OIG audit report was issued on August 30, 1983, sometime after which it was sent to the ASCS Minnesota State Office (STO) for review by various program specialists. The STO forwarded the audit to Clay County on October 3, 1983. AR, p. 302. The State Executive Director (SED), Donald Friedrich, requested a reply by October 26, 1983. AR, p. 302. Meanwhile, on October 20, 1983, the findings of the OIG audit were reviewed by the COC in an Executive Committee meeting. *See* AR, p. 162. The minutes of this meeting contain no references to indicate that Mr. Hedman informed the COC that he had been briefed on the deficiencies at the conclusion of the field survey. Further, there are no references to any corrective measures that were taken by Mr. Hedman to address those deficiencies in the intervening months between the conclusion of the field survey on June 20, 1983, and the COC Executive Committee review of the findings on October 20, 1983.

Moreover, the record shows no effort by Mr. Hedman to reply to the SED directive by the target date of October 26, 1983. Instead, the SED thereafter made four telephone calls, on November 4, 17, 21, and 23, before Mr. Hedman responded in a memorandum dated November 29, 1983. AR, p. 301. At that time, Mr. Hedman informed the SED that a "rotation" [8] had taken place on loan number 18, that an August 18 measurement of collateral on loan number 77 showed that it was 98% of the amount needed to satisfy the PIK, and that the moldy corn identified under loan numbers 448 and 660 would be replaced by the producer within 30 days. AR, p. 301.

The SED acknowledged receipt of this memorandum on December 8, 1983, and directed Mr. Hedman to advise the STO as to the action taken on loans 448 and 660. AR, p. 300. The record shows that Mr. Hedman did not respond to this request, and further, that no action was taken to replace the moldy corn.

Next, on December 30, 1983, the OIG sent a memorandum to the SED requesting further information on each of the four Clay County loans. The OIG stated that following "our review of the Clay County reply, dated November 29, 1983, we have concerns over the delay in correcting out of condition loan collateral and acting on collateral shortages." AR, p. 298. With respect to loan numbers 18 and 77, the OIG sought to determine whether the producers involved were improperly permitted to use current year production to cover the shortages found in loan collateral during the June OIG audit. The OIG also queried the SED on loan numbers 448 and 660, asking if and when the collateral replacement was completed and whether those actions were timely. AR, pp. 298–299. The SED forwarded a copy of the OIG request to Mr. Hedman on January 11, 1984, seeking a reply by January 18, 1984. Mr. Hedman again failed to comply with this directive.

Finally, on February 2, 1984, the SED directed the DD, June Hanson, to visit the Clay County office to meet with Mr. Hedman in an effort to obtain a clear and final response to the concerns expressed by the OIG in its December 30, 1983 memorandum. AR, p. 296. Mr. Hedman subsequently filed a response on February 6, 1984, which basically recited the history of action on each of the problem loans. However, that memorandum also shows that no corrective action had been taken on any of the four deficiencies identified by the OIG audit of June 20, 1983. AR, p. 295. Both the SED and the DD were dissatisfied with Mr. Hedman's reply. AR, pp. 293–294. Consequently, on February 16, 1984, the SED directed Mr. Hedman to take *immedi-*

---

**8.** A "rotation" occurs when a portion of grain is removed from storage along with a deposit of grain from current production.

*ate action* on all four of the problem loans, stating "[i]t is unfortunate that these matters were not timely settled." AR, p. 292.

On February 23 and 24, 1984, Mr. Hedman informed the concerned producers that the OIG required him to call their loans and assess liquidated damages in appropriate cases. AR, pp. 288, 289, 291. Also, on February 24, 1984, Mr. Hedman notified the SED that these corrective measures had been taken. AR, p. 290. Thereafter, the SED, on February 29, 1984, acknowledged receipt of Mr. Hedman's February 24 memorandum, directing him at that time to forward a follow-up reply on the status of each loan in 30 days. AR, p. 286. On March 16, 1984, Mr. Hedman filed a response which, in a general manner, indicated that the problems identified in the OIG audit of June 20, 1983 had been resolved. AR, pp. 281–282.

Shortly after the receipt of this reply, the SED, on April 4, 1984, arranged a meeting with the COC and the DD. AR, p. 278. The stated purpose of the meeting was "to discuss and resolve the PIK Audit Report, and the replies furnished by your CED [Mr. Hedman] ... [w]e will also discuss other management concerns we have about the *operation of your office.*" AR, p. 278. This meeting was held on April 11, 1984, to address Mr. Hedman's alleged performance deficiencies. Those present at this meeting included the three members of the Clay County COC, Raymond Grover, Roger Hegland, and Herbert Aakre, the SED, Donald Friedrich, the State Administrative Chief (SAC), Maynard Frost, and the DD, June Hanson.

At that meeting the SED addressed the perceived problems in the Clay County office, most of which were related to the handling of the problems associated with the OIG audit. AR, p. 263. The SED prepared a memorandum outlining the nature of the problem, noting that the STO had previously contacted the Clay County CED with six written memoranda and four recorded telephone conversations on the subject of the OIG audit deficiencies in Clay County. Further, the COC was told that Mr. Hedman had, on more than one

occasion, verbally informed the DD that he was unaware of the aforementioned deficiencies at the time the OIG audit was completed. AR, pp. 263, 276; *see also* Hanson, Tr. pp. 208–209. However, the OIG had previously furnished the DD and the SED with a handwritten report, signed by Mr. Hedman on June 20, 1983, in which he acknowledged each of the problems that were cited in the subsequent OIG audit. AR, pp. 263, 276. The SED stated that said handwritten report provided by the OIG was "inconsistent with verbal reports given to [the] District Director.... [t]he inconsistency of the statement to audit signed by [Mr. Hedman] and the verbal statements given to [the] District Director, the vague replies, and the lack of concern with replying to Audit Reports cannot be tolerated." AR, p. 276.

The record shows that the COC was surprised by these revelations because they had not been previously informed of these problems. AR, p. 263. Those present at the meeting also discussed numerous other alleged management deficiencies, including failures to settle commodity loans at maturity. The COC also expressed their "deep concern" regarding the present manner in which the Clay County office was being managed by Mr. Hedman. All agreed that something must be done, and it was consequently resolved that a meeting would be held with Mr. Hedman on April 12, 1984. AR, p. 263.

The April 12, 1984 meeting was held, and Mr. Hedman was informed of the concerns expressed the day before by the COC, SED, SAC, and DD. This was the *only* time that Mr. Hedman was counseled on the subject of his performance deficiencies. A memorandum from the SED, dated April 11, 1984, was issued, entitled "Corrective Management Actions." AR, p. 261. Mr. Hedman was instructed to take a variety of actions, including the preparation and submission of detailed monthly work plans that were to specify work schedules, and how the work was to be accomplished. The memorandum also provided that a review of Clay County operations would take place in six months, an arrangement to which

Mr. Hedman assented in writing on April 13, 1984. AR, pp. 249–250.

Mr. Hedman attempted to overcome the alleged deficiencies. In this connection, he filed reports on April 20, May 24, June 22, and July 20, 1984, of work plans, work in progress, and work assignments. AR, pp. 237–248. Apparently, however, his efforts were determined to be insufficient, for, on July 26, 1984, the COC contacted the SED, asking for a meeting to discuss continuing problems in the Clay County office. AR, p. 234. That meeting, attended by the COC, the DD, the SED, and the SAC, took place on August 7, 1984, at which time they requested guidance on the proper steps to be taken to terminate Mr. Hedman. AR, p. 232. The COC expressed its desire to terminate Mr. Hedman, which led the SAC and the SED to explain that there was a difference between separations "without prejudice" and removals "for cause."

After considering these differences in a lengthy discussion at this meeting, the COC decided to dismiss Mr. Hedman "for cause." The STO later was provided with its reasons for such action, and the COC thereafter relied on the STO for the preparation of all notice and procedural memoranda in the matter. Thus, on August 20, 1984, Mr. Hedman was served with a Notice of Suspension "for failing to perform the duties of ... employment and for impeding the effectiveness of programs administered in the county." Specifically, the notice stated that Mr. Hedman:

(1) Failed to keep the Clay County Committee (COC) informed of the status of various programs and operations in the office, such as clearing Audit Report 339–39. In addition, [Mr. Hedman] failed to inform the COC that [he] accepted a bid for aerial observation ... which [Mr. Hedman] was later forced to cancel. We (the COC) were completely surprised by the discrepancies uncovered during the State Office review meeting of April 11, 1984.

(2) Failed to practice effective personnel management, resulting in a poorly trained and uninformed county office staff which contributed to a rapid turnover of personnel. The District Director (DD) has had to assist you in assigning and completing routine activities.

(3) Failed to complete work assignments, including the following:

(a) Form CCC–680 had not been sent to KCMO [Kansas City Management Office] for 47% of the loans checked in a recent review.

(b) 1981 barley loans no. 1 and 2 matured in April, 1983 or earlier and were delivered in April, 1984. Settlement notices were not sent to KCMO until August 10, 1984.

(c) CCC funds collected from producers were not transmitted to FRB [Federal Reserve Bank] in a timely manner. Clay County is a heavy workload county receiving many payments: however, no repayments were transmitted during the recent period of approximately August 6 to August 15.

(d) A backlog of approximately 150 proven yields has not been completed. This work should have been completed by June 1, 1984.

(e) IYC [Individual Yield Coverage] work required [Mr. Hedman] to seek outside help from FCIC [Federal Crop Insurance Corporation] in order to finish the job which could and should have been handled by the county office staff. [Mr. Hedman] brought in FCIC help without approval of either the DD or COC.

(f) Audit report 399–39CH has yet to be cleared. It was issued in June, 1983. Ron Brakke has not delivered corn under the loan and [Mr. Hedman] did not take action to have it delivered.

AR, pp. 230–231.

Mr. Hedman responded to these three general charges on August 23, 1984. Nevertheless, the COC refused to effectuate a reinstatement, and thereafter terminated Mr. Hedman "with prejudice" on September 5, 1984, thereby barring him from future employment with the ASCS pursuant to the authority of 25 C.F.R. § 7.29. AR, p. 225. This action was appealed to the State ASCS Committee on September 18, 1984, which denied Mr. Hed-

man's request for reinstatement and back pay on October 15, 1984. Mr. Hedman appealed again on November 7, 1984, this time to the Deputy Administrator, State and County Operations (DASCO) in Washington, D.C. A hearing was held on January 18 and 19, 1985, before a DASCO representative in Morehead, Minnesota.

The hearing officer prepared a detailed and lengthy statement of facts and an analysis of both the general and specific charges leveled against Mr. Hedman in the August 20, 1984 Notice of Suspension. This report was submitted to the DASCO on March 14, 1985. It concluded that all of the listed deficiencies in Mr. Hedman's performance as CED, both general and specific, were supported by the record. Of the grounds purportedly supporting the "for cause" dismissal, the hearing officer determined that those set out in charge 1, alleging that Mr. Hedman failed to keep the Clay County COC informed of various programs and operations in the office, were by far the most serious.

Problems associated with the 1983 audit report were viewed as particularly egregious. Thus, the hearing officer stated:

> Concerning specific charge number 1 [that Mr. Hedman failed to keep the COC informed of the status of various programs and operations in the office] the record shows that Mr. Hedman did fail to keep the Clay COC informed on various matters requiring their action. Most flagrant to these failings was Mr. Hedman's failure to present OIG Audit findings for COC action shortly after the auditor first informed him of measured reserve loan collateral shortages and collateral grain which was going out of condition. Such should have been discussed during the COC meeting held on June 23, 1983. Mr. Hedman also failed to take timely action himself and otherwise exhibited a disregard for estab-

lished and required program procedures following the June 20, 1983, exit briefing.

\* \* \* \* \* \*

> *We have determined that these combined failures (the failure to timely inform the COC of possible program violations and to otherwise pursue timely actions to confirm and address OIG audit findings) clearly support the removal for cause action.*

AR, pp. 504, 506 (emphasis added).

Upon review of the record, the hearing officer concluded that the general charges against Mr. Hedman were sufficient to justify the dismissal "for cause." More precisely, it was determined that Mr. Hedman "failed to perform the required duties of his position and that his actions and failure to take appropriate actions impeded the effectiveness of ASCS programs administered in Clay CO." Therefore, it recommended that the "for cause" termination stand, and that the bar against future federal employment with ASCS, pursuant to 7 C.F.R. § 7.16, should also be affirmed. The report was subsequently adopted by the DASCO, and as a consequence, Mr. Hedman's request for reinstatement and other benefits retroactive to the date of his suspension was denied by an order dated March 18, 1985. By this final administrative action, Mr. Hedman exhausted all of his mandatory administrative remedies.[9]

*Contentions*

In general terms, it is Mr. Hedman's position that the actions of both the COC and the ASCS hearing officer were arbitrary and capricious, in that the record does not support a "for cause" termination. To the contrary, he argues that the record justifies, at most, a dismissal "without prejudice." As the primary basis for his motion for summary judgment, Mr. Hedman asserts that the record does not contain the required quantum of "substantial evidence" that is necessary to sustain the findings and decision of the hearing officer.[10]

---

**9.** The determination of the DASCO is final and not subject to further administrative review. *Hedman,* 15 Cl.Ct. at 308, n. 8, *citing* 7 C.F.R. § 7.34.

**10.** Mr. Hedman also argues that the determination of the hearing officer was *prima facie* arbitrary and capricious because he purportedly failed to consider all of the material facts, namely, the testimony of Raymond Grover,

Furthermore, it is alleged that the COC, the entity that is responsible for the subject suspension and termination actions, failed to comply with the relevant procedures set out in what is known as Publication 22–PM.[11] Additionally, Mr. Hedman avers that the COC was unaware of, and thus did not even contemplate, some of the various termination factors explicated in the manual. In particular, he argues, *inter alia*, that the COC (1) did not consider certain factors contained in ¶ 413A; (2) did not engage in sufficient counseling as required under ¶ 433; (3) did not consider whether the facts supported a "for cause" removal beyond a reasonable doubt under ¶ 446B; and (4) did not consider any of the alternative actions described in ¶ 446C.

The defendant, on the other hand, argues that the "for cause" termination was both procedurally and factually correct. It alleges that the findings of fact rendered by the hearing officer are supported by substantial evidence in the administrative record. It further avers that the ASCS followed all of the termination "for cause" procedures outlined in Publication 22–PM. It argues that Publication 22–PM requires only that "for cause" terminations be based on one or more of the grounds stated in ¶ 444B, and that the dismissal process comply with the steps set out in ¶ 444A. Under this interpretation of Publication 22–PM, it is the defendant's view that counseling is not a mandatory step in "for cause" dismissals. Finally, the defendant argues

that the charges against Mr. Hedman were proven beyond a reasonable doubt under ¶ 446B.

*Discussion*

The broad issue here is—whether the defendant acted arbitrarily, capriciously, with an abuse of discretion, contrary to the law, or in a manner that does not otherwise comply with statutory, procedural, or constitutional criteria when it separated Mr. Hedman "for cause."[12] Essentially, Mr. Hedman argues that the ASCS decision was arbitrary and capricious because the agency determination was both procedurally and factually defective. He asserts that the agency did not follow several of the procedural steps contained in Publication 22–PM, and that the decision to terminate "for cause" was not backed by the required amount of substantial evidence. In this context, there are two questions that need to be answered:

1) Was the agency determination factually defective, and thus arbitrary and capricious, in light of the evidence cited in support of its decision? and

2) Was the agency determination procedurally defective, and thus arbitrary and capricious, in its application of the separation and removal process described in Publication 22–PM?

The resolution of these two questions involves only a narrow inquiry that must be strictly limited to the administrative

Chairman of the COC. Consequently, Mr. Hedman has submitted the deposition testimony of Mr. Grover as new evidence for our consideration here, in addition to the stipulated administrative record. The general rule on the submission of new evidence is that it is permissible "only if it was unavailable below or if plaintiff makes a 'strong showing of bad faith or improper behavior' that creates 'serious doubts about the fundamental integrity of the administrative action.'" *E.g., Krzeminski v. United States,* 13 Cl.Ct. 430, 437 (1987) (citations omitted). We have thoroughly examined the testimony of Mr. Grover, and we find that it is unnecessary for us to rule on its admissibility, because we think it adds nothing of substance to plaintiff's position, and further because our decision would be the same regardless of its inclusion or exclusion. *See infra.*

11. It is undisputed that the terms and conditions applicable to the contested removal are con-

tained in Publication 22–PM, Part 10, ¶¶ 411–459 (August 8, 1984). *See Hedman,* 15 Cl.Ct. at 307, n. 6. The relevant text of those portions of Publication 22–PM at issue in this matter are set out and discussed *infra.* Many of those provisions are codified in general terms in 7 C.F.R. §§ 7.29–7.31.

12. We address this broad issue pursuant to the guidance of RUSCC 56(c), which states that summary judgment is appropriate if "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Given the stipulated administrative record filed by the parties in this case, we find that there are no genuine issues of material fact, and thus, the matter is amenable to resolution on the subject cross-motions for summary judgment.

record. *See, e.g., Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *S & G Excavating v. United States,* 15 Cl.Ct. 157, 161 (1988). While the scope of our review is circumscribed, we have nevertheless engaged in a "thorough, probing, in-depth review" of the agency action at issue here, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* 401 U.S. at 416, 91 S.Ct. at 824. Such an inquiry does not, however, permit us to substitute our judgment for that of the agency. *Id.*

The ASCS decision to terminate Mr. Hedman for cause is, we note, entitled to substantial deference. *See, e.g., Rogers v. United States,* 14 Cl.Ct. 39, 46 (1987) (citation omitted), *aff'd,* 861 F.2d 729 (Fed.Cir. 1988). It is well established that the ASCS determination cannot be overturned simply because we could reach a different conclusion than that of the agency. *See, e.g., California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 783 (1986) (citations omitted). Thus, our examination of the issues presented in this case does not focus on whether we agree with the decision to remove Mr. Hedman "for cause," but rather, the essence of our review is for the purpose of ensuring that the agency engaged in *reasoned and rational decision-making. See, e.g., Rogers,* 14 Cl.Ct. at 46 (citations omitted); *see also Gaskins v. United States,* 227 Ct.Cl. 563, 566, 652 F.2d 70 (1981) (review is limited to a determination of "prejudicial procedural error and whether the action was taken according to law and regulations, was supported by substantial evidence, had a rational basis and was in good faith"). In this sense, we must presume that the ASCS acted correctly and with regularity. *See, e.g., Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. Indeed, Mr. Hedman bears the onerous burden of producing well-nigh irrefragable proof to overcome this presumption. *See, e.g., Benton v. United States,* 6 Cl.Ct. 781, 786 (1984) (citations omitted); *see also*

*Poschl v. United States,* 206 Ct.Cl. 672, 692 (1975) (citations omitted).

We now turn to Mr. Hedman's assertion that, if indeed any removal was justified, he should have been separated without prejudice, insofar as the ASCS decision to terminate for cause was supposedly both procedurally and factually defective. At the outset we observe that a reversal of the agency action here can be accomplished "only upon a showing that there has been substantial noncompliance with statutes and regulations, that the action on the part of the government officials involved was arbitrary or capricious, or that there was not substantial evidence supporting the action." *See e.g., Krzeminski v. United States,* 13 Cl.Ct. 430, 437 (1987), *citing Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102, *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *California Canners & Growers,* 9 Cl.Ct. at 782–783. Thus, in order to reverse the decision of the ASCS determination on any of these grounds, the evidence supporting such action must be clear and convincing. *See Krzeminski,* 13 Cl.Ct. at 436, *citing Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986) (other citations omitted).

Stated another way, in cases such as this, our review is limited to a determination of whether the agency action is "illegal because it violates applicable statutes or regulations, or is demonstrably in bad faith or malicious because it is arbitrary, capricious, or devoid of substantial evidence to support it." *See, e.g., Wathen v. United States,* 208 Ct.Cl. 342, 351, 527 F.2d 1191, 1197 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976), *cited in Benton,* 6 Cl.Ct. at 785. We find, for the following reasons, that Mr. Hedman has not advanced the required quantum of clear and convincing evidence necessary for us to conclude that the decision of the ASCS was arbitrary and capricious. The facts upon which the agency based its determination to terminate "for cause" are supported by substantial evidence in the record, and further, we find that the agency fully complied with the procedures de-

scribed in Publication 22–PM. We now address each of these issues seriatim.

### A. *The Facts Are Supported By Substantial Evidence*

■ Mr. Hedman avers that the determination below was arbitrary and capricious because it was not supported by substantial evidence. Agency action is arbitrary and capricious to the extent the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to the difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *S & G Excavating*, 15 Cl.Ct. at 161–162. A determination unsupported by substantial evidence is one which lacks " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citation omitted). "[S]ubstantial evidence is more than a scintilla, it is evidence that affords a reasonable basis for [an] inference of the fact in issue." *Max Jordan Bauunternehumng v. United States*, 10 Cl.Ct. 672, 676 (1986), *aff'd* 820 F.2d 1208 (Fed.Cir.1987), *citing Koppers Co. v. United States*, 186 Ct.Cl. 142, 149–151, 405 F.2d 554, 558–559 (1968).

The ASCS hearing officer concluded that the "for cause" termination was supported entirely by the allegations listed in charge 1, *see supra*. There Mr. Hedman was charged with failing to perform the duties of his office and impeding the effectiveness of ASCS programs, insofar as he did not keep the COC informed of the status of various programs and operations in the Clay County office.[13] According to the hearing officer, the most serious charge justifying the COC decision to terminate for cause concerned Mr. Hedman's actions, or lack of action, with respect to the OIG audit report.

Upon a thorough review of the record, we find that this determination is supported by *overwhelming* evidence, both documentary and testimonial. The record shows that Mr. Hedman did indeed fail to inform the COC of problem loans disclosed in the audit. He was required to advise the COC on these matters pursuant to the duties of his employment. *See* CED Job Description, note 13, *supra*. Additionally, the record also supports the hearing officer's conclusion that Mr. Hedman did not take appropriate individual action to address the deficiencies raised in the audit, actions which we think he was required to take. *See id.*

Most importantly, however, we find that the record paints a clear picture showing that Mr. Hedman deceived the COC, the DD, the SED, and the SAC with respect to his knowledge of those problem loans following the completion of the audit field survey in June of 1983. The record plainly and unequivocally demonstrates that Mr. Hedman received a June 20, 1983 exit briefing that disclosed certain problem loans, that Mr. Hedman acknowledged those problems in a handwritten memorandum on that same day, that Mr. Hedman did not inform any of his superiors of either the exit briefing or the problems, that Mr. Hedman took no immediate steps to correct those problems until well after the final audit was filed, and that Mr. Hedman ac-

---

**13.** According to Mr. Hedman's job description, the CED "[i]s [generally] responsible to COC for effective management and administration of the assigned programs and activities for which the County office is responsible, including office and field work." His principal responsibilities included, among others, the obligation of "[c]arrying out procedures and policies of COC and keeping COC *currently* advised on the status of various programs." Publication 22–PM, Exhibit 4 (emphasis added). Further, "[the] CED is responsible to COC for the effective perform- ance of assigned duties and responsibilities. COC determines policies to follow in administration of programs but *depends* upon CED to interpret and apply National and State procedures and instructions in operations of the County Office. *Accomplishment of goals and effectiveness of work is determined by COC through exchange of information and discussion of County Office business through regular and special COC meetings.* [The] CED may also receive assistance and guidance from DD and State Office staff." *Id.* (emphasis added).

tively *concealed* his early and continuing knowledge of those problems until he was finally confronted with his own June 20, 1983 responses on April 12, 1984. On these facts, we find that both the COC and the hearing officer correctly determined that Mr. Hedman failed to perform the duties of his employment and that he impeded the effectiveness of ASCS programs. Thus, the termination for cause was plainly justified on the grounds listed in specific charge number 1.[14]

The OIG audit field survey was completed on June 20, 1983, and it disclosed at least four problem loans in Clay County. On that date the auditor gave Mr. Hedman an exit briefing to inform Mr. Hedman of these deficiencies. Mr. Hedman responded to each of the deficiencies discovered by the auditor in a handwritten memorandum, which he then returned to the auditor. There Mr. Hedman himself acknowledged that loan numbers 18 and 77 had indications of unauthorized removals of CCC collateral. He further agreed that corrective action was necessary, steps which he nevertheless failed to take. Mr. Hedman was also apprised of CCC collateral going out of condition due to mold, a situation which obviously called for immediate corrective measures. However, Mr. Hedman alleges that he did not keep a copy of either the preliminary audit findings or his response on the problem loans under his supervision. Further, Mr. Hedman implies that he took no steps to correct these deficiencies because there are no regulations which require him to take action in response to an exit briefing. We find these attempted explanations insufficient to justify the overwhelming evidence of continuing inaction and lack of disclosure.

The final OIG audit was completed on August 30, 1983, after which it was delivered to the Minnesota STO for review by various program specialists. It was sent to Clay County on October 3, 1983, and the COC minutes show that it was reviewed on October 20, 1983. The record also shows that there was no discussion of, or corrective action on, any of the problems identified in the preliminary field survey between June 20, 1983 and October 20, 1983, deficiencies of which Mr. Hedman was informed in the June 20, 1983 exit briefing, a period covering four months and nine COC meetings.

Prior to the October 20, 1983 COC meeting, Mr. Hedman did not disclose either his knowledge of the audit findings or that he had been briefed on those deficiencies. In fact, the record shows that Mr. Hedman actively concealed his knowledge of the problems discovered in the field survey. On several occasions, Mr. Hedman informed the DD, June Hanson, that he was *unaware* of any loan problems until after the final audit was sent to Clay County on October 3, 1983. Hanson, Tr. p. 208. After the DD repeatedly inquired whether he had received an exit briefing, Mr. Hedman finally stated "I did not know of any of these problems when the auditor left and I am not going to talk to you about this audit anymore." Hanson, Tr. p. 209.

Mr. Hedman made similar misrepresentations to several other supervisory personnel. Shortly after the field survey was completed in June of 1983, Herbert Aakre, one of the three COC members, inquired "How did we come out," to which Mr. Hedman responded "We're clean." Aakre, Tr. p. 184. Roger Hegland, another mem-

---

14. The hearing officer did not rely on the allegations in charges 2 and 3 to support his ultimate decision, but observed that they corroborated the termination for cause decision of the COC. Like the hearing officer, we find that the removal for cause is supported by charge 1, and therefore, an extended analysis of charges 2 and 3 is unnecessary. However, based upon our searching review of the record, we find that those two charges are also supported by substantial evidence. While Mr. Hedman expends great effort disputing the facts which support these charges, we observe that "even though the record con-

tains evidence which supports a contrary position," that contrary evidence will not invalidate the factual determinations of the agency when, as is the case here, they are supported by substantial evidence. *See Erickson Air Crane Co. of Washington, Inc. v. United States,* 731 F.2d 810, 814 (Fed.Cir.1984); *Benton,* 6 Cl.Ct. at 787 (citations omitted). *See also United States v. Carlo Bianchi and Co., Inc.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963) ("A decision may be supported by substantial evidence even though it could be refuted by evidence that was not presented to the decision-making body.").

ber of the COC, recalled that Mr. Hedman informed the COC that there were no problem loans disclosed by the audit shortly after the auditor completed the field survey in June of 1983. Hegland, Tr. p. 21. In the course of subsequent efforts to close the audit, Mr. Hedman told the SAC, Maynard Frost, that he was displeased because "he didn't know what was in the audit when the auditor left. The auditor was in a hurry, he had to get to another county and he [Mr. Hedman] wasn't informed." Frost, Tr. p. 290.

This charade was not exposed until April of 1984, a period of almost 10 months after the June 20, 1983 exit briefing, and only after the STO found Mr. Hedman's actions on the problem loans unresponsive, inadequate, and untimely. As previously noted, the record shows that, between October 20, 1983 and April of 1984, the STO made six written requests and four telephone calls to Mr. Hedman in its repeated, unsuccessful attempts to close the audit. According to Maynard Frost, the audit took longer to close than any other conducted over the 14 years he had been employed in the capacity of SAC. See Frost, Tr. p. 311. In fact, OIG auditors made three personal visits and wrote three memoranda to the STO over this period seeking a final report to close the audit, efforts which were hindered by Mr. Hedman's inaction. See Frost, Tr. p. 311.

The DD, based on the representations by Mr. Hedman, consistently and adamantly assured the STO that there had been no exit briefing. Hanson, Tr. p. 210; Frost, Tr. p. 291; Friedrich, Tr. pp. 366–367. The DD continued to defend Mr. Hedman until, in a March or April meeting with the SED (Mr. Friedrich), the SAC (Mr. Frost), and OIG auditors, it was learned that Mr. Hedman had in fact been briefed at the conclusion of the field survey, and further, that he had made a written response on each of the problem loans. The auditors immediately produced a copy of those responses

and showed it to the DD, the SAC, and the SED. Hanson, Tr. p. 210; Frost, Tr. pp. 291–292; Friedrich, Tr. pp. 366–367.

This apparently helped to trigger the meeting of April 11, 1984, at which time the DD, SAC, and SED informed the COC of all the facts relevant to the audit, along with other perceived management deficiencies. The three members of the COC, previously unaware of any of these problems, were surprised at the disclosures of Mr. Hedman's exit briefing response and poor office management. These people met with Mr. Hedman the next day, at which time he insisted that "he had never seen, never had an exit audit with the audit people." Friedrich, Tr. p. 366. At this point, the SED produced the June 20, 1983 handwritten responses, to which Mr. Hedman replied only that he had forgotten that he had written and signed that document. Friedrich, Tr. p. 366. This was the first time Mr. Hedman acknowledged the exit briefing and the obvious fact that he had been aware of the problems identified by the auditor in that report.

On the basis of these facts alone, we think that the COC had grounds to institute an immediate "for cause" termination.[15] However, it consented to the corrective management memorandum proposed by the STO. We think that the counseling session shows eminently reasonable action under the circumstances. Nevertheless, events over the next several months convinced the COC that removal was necessary. The decision to separate Mr. Hedman for cause was made on or about August 7, 1984. According to Roger Hegland, one of the three COC members, removal was appropriate because there was a "credibility problem" that became evident after the meetings of April 11 and 12, 1984. Hegland, Tr. p. 28. Herbert Aakre stated that, after the April meetings, he no longer trusted Mr. Hedman, insofar as he felt that the COC was still poorly informed about

---

15. Under Publication 22–PM, ASCS employees are required to conform to certain basic standards of conduct. Employees such as Mr. Hedman are obligated to act with honesty and integrity, ¶¶ 393A(1), (2), and to ensure, among other things, the proper performance of ASCS business, ¶ 393B(1). We think it is clear that Mr. Hedman violated these norms of conduct in the suppression of his knowledge of the OIG audit findings.

what was happening in the office. Aakre, Tr. p. 154.

Therefore, we find that the COC decision to terminate "for cause" was based on substantial evidence, if for no other reason than the undisputed evidence of misrepresentation and concealment on the audit exit briefing. The well-documented evidence showing Mr. Hedman's individual failures to inform the COC on this and other matters, and his failure to institute corrective measures, as appropriately noted in the findings of the hearing officer, further bolsters that decision. When these facts are considered along with the remaining indicia of office mismanagement, the COC was justified in its action. These bases serve as proper grounds for the hearing officer to conclude that Mr. Hedman both failed to perform the duties of his employment and impeded the effectiveness of ASCS programs and operations. Having found that this determination was based on substantial evidence, we now turn to Mr. Hedman's allegations of procedural error.

B. *The Agency Followed The Procedures Described in Publication 22–PM*

■ Mr. Hedman contends that the termination "for cause" did not comply with the separation and removal guidelines in Part 10 of Publication 22–PM. In response to an allegation of arbitrary and capricious action based on procedural error, the agency action in question need only be in *substantial* compliance with applicable regulations. "A litigant is required to show demonstrable prejudice to support a charge of procedural error. A rule allowing technical procedural infractions to control the outcome of a case, without a showing of prejudice flowing [from that infraction], would promote form over substance." *Laningham v. United States,* 2 Cl.Ct. 535, 556 (1983). Thus, assertions of procedural error at the agency level are to be reviewed under the harmless error standard. *Sterlingwear of Boston, Inc. v. United States,* 11 Cl.Ct. 879, 889 (1987), *citing Harp v. Dept. of Army,* 791 F.2d 161, 163 (Fed.Cir. 1986) (other citations omitted). Accordingly, our task is to determine whether a material procedural error occurred, and if so, whether the alleged error had a material impact on the ultimate decision. *Sterlingwear,* 11 Cl.Ct. at 883 (citations omitted). Here, after having examined each of the claimed procedural errors, *infra,* we find that both the COC actions and the hearing officer's review *fully* complied with the separation and removal procedures of Publication 22–PM. Therefore, we do not reach the question of whether the alleged errors had a material impact on the ASCS decision to terminate Mr. Hedman for cause.

■ Mr. Hedman first avers that Publication 22–PM required counseling, which, in his case, was either denied or inadequate. We disagree. Mr. Hedman was charged for having both failed to perform the duties of his office or employment under 22–PM, ¶ 444B(1), and impeding the effectiveness of Clay County programs and operations under 22–PM, ¶ 444B(2). These grounds are among seven reasons listed as sufficient to support a "for cause" removal under 22–PM. This being the case, the ASCS is required only to comply with separation procedures outlined in ¶ 444A(1)–(4). That section provides:

444 PROCEDURE AND GROUNDS FOR REMOVAL

A procedure to separate an employee *for cause* includes:

1 Issuing a suspension notice.

2 Right of reply to suspension notice.

3 Determining whether to remove or restore employee to duty and issuing a notice of the decision.

4 Appeal of removal decision or disqualification for further service, if person resigns during suspension or is otherwise determined to be disqualified.

(emphasis added).

Clearly, counseling is not a *required* step in the removal for cause process. The ASCS issued a Notice of Suspension on August 20, 1984, which specifically informed Mr. Hedman that he had a "right of reply." Mr. Hedman exercised this right on August 23, 1984, after which the ASCS,

by its written response of September 5, 1984, determined that removal "for cause" was appropriate. Mr. Hedman was again provided the right to appeal, which lead him to seek an agency hearing, held on January 18–19, 1985, which found that the removal "for cause" was supported by the record. Thus, we find that the ASCS was not required to counsel Mr. Hedman, and further, that it fully complied with each and every procedural step in the termination-for-cause provision of ¶ 444.[16]

■ Next, Mr. Hedman vigorously alleges arbitrary and capricious action on behalf of the COC, in that it supposedly failed to consider other relevant procedures contained in Publication 22–PM. In this connection, he contends that the COC did not properly determine the course of action under ¶ 413A(1)–(7), did not determine whether the facts supported the termination for cause action beyond a reasonable doubt under ¶ 446B(1), and did not consider any of the alternatives to removal under ¶ 446C(1)–(7). Together, these paragraphs provide as follows:

413 DETERMINING THE TYPE OF ACTION

A Determine type of action according to:

1 The seriousness of the employee's deficiencies.

2 How long deficiencies have existed.

3 The quality of the employee's overall work history.

4 Personal reasons beyond the employee's control that may have contributed to the deficiencies.

5 The assistance given to the employee to improve deficiencies.

6 Employee's cooperation in any improvement efforts.

7 Work relationships that negatively affect office operations or employee's job performance.

\* \* \* \* \* \*

446 DETERMINATIONS AND ACTION

A Review all facts available to determine whether the alleged acts are consistent with subparagraph 444B [Grounds for Removal].

B Obtain complete information and determine whether the facts relating to the charges are severe enough to require removing the employee.

1 If there is a reasonable doubt about any of the charges or underlying facts, do not consider them.

2 If the facts are unclear, request OIG to make a formal investigation of the matter. Provide OIG with as much detail as possible.

C The following alternatives to removal may be available:

1 Counseling.

2 Training.

3 Improved Supervision.

4 Assistance from the State Office.

5 A letter of reprimand.

6 Reassignment.

7 A combination of the alternatives in subparagraphs 1 through 6.

We again disagree. The record shows, both expressly and implicitly, that the COC was advised of, considered, followed, and fully complied with these guidelines. This is demonstrated most thoroughly by a review of the testimony of those who attended the August 7, 1984 meeting, at which time, or shortly afterwards, the COC decided to terminate Mr. Hedman for cause. It was in this meeting that the three members of the COC (Raymond Grover, Roger Hegland, and Herbert Aakre), the DD (June Hanson), the SED (Donald Friedrich), and the SAC (Maynard Frost) discussed, *at length*, whether Mr. Hedman should be terminated for cause or without prejudice.

Prior to this time, the COC was unaware of the procedures described in Publication 22–PM, as well as the difference between

---

**16.** Because we have determined that the ASCS was not required to counsel, it is not necessary for us to decide whether the counseling given to Hedman on April 12, 1984 was adequate. We observe, however, that, in view of the facts supporting charge 1, *see supra*, that the counsel-

ing session demonstrates eminently reasonable conduct on behalf of the agency. At that time, we think that sufficient grounds existed to terminate for cause, and thus the counseling session was above and beyond any requirement of Publication 22–PM.

the two types of separations. However, during this meeting the SAC explained— that substantial grounds were needed to terminate an employee "for cause," that a "for cause" termination would put a black mark on Mr. Hedman's employment record, the bases upon which a "for cause" termination could be made under Publication 22–PM, that a "for cause" termination would have the deleterious effect of precluding Mr. Hedman from receiving severance pay and any future ASCS employment, and the overall stigmatizing effect of a "for cause" separation. *See* Frost, Tr. pp. 318–319. Furthermore, the COC was advised that it should consider alternatives to a removal "for cause" under ¶ 446, except in the most serious cases. *See* Frost, Tr. pp. 321–322.

An extended discussion of the options ensued. *See* Frost, Tr. p. 338; Friedrich, Tr. p. 363. The COC concluded, in light of the procedural information provided by the SAC and the SED, that a removal for cause was the proper course of action. At this time, the COC had undisputed evidence of Mr. Hedman's inaction and deceit with respect to the audit. It is evident that the COC considered the gravity of the situation in that Mr. Hegland thought there was a "credibility problem." Hegland, Tr. p. 28. Mr. Aakre felt that Mr. Hedman failed in his efforts to comply with the corrective management memorandum and essentially stated that he no longer trusted Mr. Hedman to deal honestly with the COC. Aakre, Tr. p. 154.

The record implicitly shows that the deficiencies were viewed as serious, and that the COC did not think these shortcomings were amenable to correction. At no time after August 7, 1984 did the COC have any reasonable doubt as to the charges leveled against Mr. Hedman. Most of those charges were based on documentary evidence, and the reasons for the ultimate decision to dismiss for cause were thoroughly addressed. Thus, we think that these facts demonstrate the COC's compliance with all of the operative provisions of Publication 22–PM. We therefore find no procedural error, prejudicial or otherwise, sufficient to support Mr. Hedman's allega-

tion of arbitrary and capricious action by either the COC or the ASCS hearing officer.

*Conclusion*

The ASCS decision to terminate Mr. Hedman "for cause" was both supported by substantial evidence and in compliance with the removal and separation procedures outlined in Publication 22–PM. As such, and on this record, we cannot conclude that the ASCS action was either arbitrary or capricious. This being the case, the defendant's cross-motion for summary judgment is GRANTED, and that of Mr. Hedman is concomitantly DENIED. The subject petition for severance pay is hereby dismissed. No costs. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.